**Clark Matthew EARLS**

v.

**Shirley Ann EARLS.**

Court of Appeals of Tennessee,
at Nashville.

May 31, 2000.

Opinion Denying Petition for Rehearing
June 20, 2000.

Permission to Appeal Denied by
Supreme Court March 12, 2001.

Thomas F. Bloom and Robyn Ryan, Nashville, TN, for appellant, Clark Matthew Earls.

R.E. Lee Davies, Franklin, TN, for appellee, Shirley Ann Earls.

## OPINION

KOCH, J., delivered the opinion of the court in which COTTRELL, J., joined.

This appeal involves a marriage irretrievably broken by a catastrophic injury to the wife. The parties separated after attempting to cope with the wife's condition for over one year, and the husband filed for an irreconcilable differences divorce in the Circuit Court for Williamson County. The wife agreed that the parties had irreconcilable differences but resisted the divorce because she desired to continue being covered by the husband's employer-provided group medical insurance. The trial court heard the evidence without a jury and declined to grant the husband a divorce or to declare the parties divorced. The trial court also awarded custody of the child to the wife despite the parties' agreement and the lack of evidence that the wife was physically and psychologically able to shoulder the responsibilities of being the custodial parent. The husband has appealed. We have determined that the record contains ample evidence to declare these parties divorced in accordance with Tenn.Code Ann. § 36–4–129(b) (Supp. 1999). We have also determined that the evidence does not support the trial court's decision to award custody of the parties' child to the wife and that the trial court's award of spousal support to the wife should be modified.

Clark Matthews Earls and Shirley Ann Holman Earls met when they were approximately twenty years old. Both worked, and Mr. Earls also boxed professionally. Their son was born in July 1991, and they were married two years later in July 1993. While Ms. Earls had been married previously, this was Mr. Earls' first marriage. The parties returned to Williamson County in 1996 after Mr. Earls failed to establish himself as a boxer in Las Vegas. Following their return, Ms. Earls managed an apartment complex, and Mr. Earls held part-time jobs at Service Merchandise Company and United Parcel Service.

Ms. Earls suffered an unexpected and catastrophic injury in March 1997 when an aneurism near her spine burst. She was left a quadriplegic and faced a long, difficult period of rehabilitation to regain even partial use of her arms and legs and to provide even a minimal level of self-sufficiency. Mr. Earls took a leave of absence from work in order to help Ms. Earls with her rehabilitation. Mr. Earls' parents also moved to Middle Tennessee for eleven months to help their son, daughter-in-law, and grandson. When Ms. Earls was released from the rehabilitation center in June 1997, the parties moved to a mobile home in Wartrace because Ms. Earls want-

ed to be closer to her father. Mr. Earls agreed to move even though it significantly increased his commute to work.

The rehabilitation process was slow and difficult. For their own reasons, each party became discouraged and depressed. Mr. Earls was frustrated because he believed that Ms. Earls was not pursuing her rehabilitation as vigorously as she could, and Ms. Earls became depressed and angry about the cruel blow fate had dealt her. Unfortunately, each party became the target of the other's frustration and anger. Eventually, the pressure and strain drove the parties apart. They began to argue frequently and to call each other names. Eventually, the tension in the household became so intense that Mr. Earls' parents decided to move back to their home in Cleveland, Tennessee rather than endure the constant fighting between their son and daughter-in-law.

As time passed, the parties became less communicative and more distant. The constant pressure and tension extinguished their feelings for each other. From Ms. Earls' point of view, Mr. Earls kept providing her care, but he was only providing her "the basics, you know, here's your food; here's your water; here's your pill; here's things that you need." From Mr. Earls' point of view, Ms. Earls continued to be angry and resentful about her injury and stopped expressing any affection for him or appreciation for his efforts to assist her. As Mr. Earls described it, Ms. Earls was "very cold and bitter," and "all I could do is to be there for her."

Approximately fifteen months after Ms. Earls' injury, Mr. Earls told her that he had contacted a lawyer and that he wanted a divorce. Ms. Earls did not disagree that their relationship was irretrievably broken, and in early July 1998, she moved out of the handicapped accessible apartment where they had moved and went to live with her mother and step-father. The parties agreed to an irreconcilable differences divorce and, on July 16, 1998, signed a marital dissolution agreement. The agreement provided that the parties would have joint custody but that the child would live "primarily" with Mr. Earls. It also provided that Ms. Earls would not be required to pay child support because Mr. Earls was receiving the child's SSI payments stemming from Ms. Earls' medical condition.

Mr. Earls filed the irreconcilable differences divorce complaint on July 17, 1998. Ms. Earls informed him that she no longer agreed to the terms in the marital dissolution agreement, and on August 5, 1998, she filed an answer and counterclaim. While she admitted that the parties had "irreconcilable differences" that were "permanent," she requested that the trial court declare the marital dissolution agreement void because it had been procured through undue influence and duress. She did not request a divorce of any sort, but she requested spousal support and a temporary restraining order preventing Mr. Earls from removing her from his employer-provided medical insurance and from concealing or dissipating marital assets. Mr. Earls denied the undue influence and duress claims, and on December 14, 1998, filed an amended complaint seeking a divorce on the ground of inappropriate marital conduct. Three days later, Ms. Earls denied the inappropriate marital conduct allegation and responded, in accordance with Tenn.Code Ann. § 36–4–120(a) (Supp. 1999), that any ill conduct on her part was caused by ill conduct on the part of Mr. Earls.

The first day of trial occurred on March 10, 1999. By this time, Ms. Earls was still not requesting a divorce of any sort but was requesting spousal support. Before the proof was taken, Ms. Earls informed

the court that the parties had agreed that Mr. Earls should have custody of the child but also insisted that she should have the right to reopen the custody question whenever she thought that she was sufficiently rehabilitated to take care of her son. The trial court responded to this announcement by suggesting joint custody with Mr. Earls being the "residential parent." When both parties agreed to the suggestion, the trial court announced: "Then that would be the decree of the court with respect to the custody issue." With the custody issue seemingly resolved, neither party presented the evidence normally associated with custody disputes.

The trial reconvened on March 26, 1999, and the parties concluded presenting their evidence and argument by noon. After deliberating for approximately two hours, the trial court returned to the bench to deliver its ruling. First, the court announced that Mr. Earls had not proved by a preponderance of the evidence that Ms. Earls had engaged in "cruel and inhuman treatment."[1] The court also concluded that Ms. Earls' "right of privacy ... estops this court from going so far as to finding any choice that she's made with respect to her body to be cruel and inhuman treatment towards Mr. Earls." Then, turning to the question of custody, the court awarded sole custody of the child to

Ms. Earls because Mr. Earls' relationship with Laura Moore "jeopardized the child in a moral sense." The court ordered Mr. Earls to pay Ms. Earls $570 per month in spousal support until her death, $300 per month in child support, as well as all her accrued and future medical expenses not covered by insurance. Finally, the court permanently enjoined Mr. Earls from "coming around Laura Moore ... to promote and protect the marriage relationship which exists and will exist in this case until I'm reversed or something new comes before the [c]ourt." On this appeal, Mr. Earls takes issue with the trial court's refusal to declare the parties divorced, its custody decision, its spousal and child support orders, and with the blanket injunction against associating with Ms. Moore as long as he was married.

## I.

### WHETHER THE PARTIES SHOULD BE DIVORCED

The trial court, perceiving itself as the protector of the institution of marriage,[2] declined to divorce the parties on two grounds. First, it concluded that Mr. Earls failed to carry his burden of proving the existence of one of the grounds for divorce in Tenn.Code Ann. § 36–4–101 (Supp.1999). Second, the trial court concluded that the parties should not be di-

---

1. The trial court commented "No way José has she done that as far as I'm concerned."

2. Over a century ago, the courts believed that they were duty bound to uphold marriage as "the most sacred of domestic relations." *DeArmond v. DeArmond*, 92 Tenn. 40, 44, 20 S.W. 422, 423 (1892). This view has long since been replaced by the less moralistic and more human view that when a marriage is irretrievably broken, both society at large and the parties themselves have "no interest in perpetuating a status out of which no good can come and from which harm may result." *Lingner v. Lingner*, 165 Tenn. 525, 534, 56 S.W.2d 749, 752 (1933); *see also Hamm v.*

*Hamm*, 30 Tenn.App. 122, 141–42, 204 S.W.2d 113, 121–22 (1947).

The trial court mistakenly believes that the General Assembly revived this outmoded notion in 1996 when it enacted Tenn.Code Ann. § 36–3–113 (1996). This statute was passed to shield Tennessee from being required to recognize same-gender marriages performed in other states. Accordingly, it extolls heterosexual marriage as the "fundamental building block of our society." It stops far short, however, of endorsing the notion that either individual or societal interests will be advanced by condemning two persons to loveless marital unions.

vorced because Ms. Earls would "be more aggressive in pursuing reconciliation" once Mr. Earls' divorce complaint was dismissed. This reasoning demonstrates a fundamental misunderstanding of the divorce statutes and a misinterpretation of the evidence.

### A.

For at least one hundred and fifty years, the courts of this state have been empowered to grant divorces when a spouse engages in "cruel and inhuman treatment or conduct towards the spouse as renders cohabitation unsafe and improper." Tenn. Code Ann. § 36–4–101(11); Code of Tennessee § 2449(1) (1858). The courts' view of the type of conduct that amounted to cruel and inhuman treatment has changed over the years. For a long time, the type of treatment that was considered cruel and inhuman enough to warrant a divorce consisted of "the willful, persistent causing of unnecessary suffering, whether in realization or apprehension, whether of body or mind, in such a way as to render cohabitation dangerous and unendurable." *Gardner v. Gardner*, 104 Tenn. 410, 412, 58 S.W. 342, 343 (1900) *overruled on other grounds, Jackson v. Jackson*, 186 Tenn. 337, 342, 210 S.W.2d 332, 335 (1948); *Russell v. Russell*, 3 Tenn.App. 232, 245 (1926).

The courts further limited the conduct that would support a divorce on the grounds of cruel and inhuman treatment by pointing out that "[m]ere acerbity of temper, occasional reproaches, rude language by the husband toward the wife, and even threats of violence where none is attempted,[3] do not constitute ground[s] for divorce under our statutes." *Watson v. Watson*, 25 Tenn.App. 28, 34, 149 S.W.2d

953, 957 (1940). In those days, the courts required acts of "cold-blooded cruelty and barbarity, on the part of husbands toward dutiful and innocent wives"[4] in order to protect the institution of marriage from the complaints of a wife who "permits herself to become very unhappy and dissatisfied with her condition by magnifying the faults and indiscretions of her husband, brooding over imaginary wrongs, or indulging in a feeling of opposition to that authority and control which properly belongs to him, as head of the family." *Shell v. Shell*, 34 Tenn. at 722.

Those chauvinistic days have long since passed, and this court has marked their passing on at least two occasions. First, in 1988, the Eastern Section held that conduct no longer must be dangerous or unendurable to amount to cruel and inhuman treatment. In doing so, the court granted a husband a divorce from a suicidal wife because "any series of misconduct which makes continued cohabitation unacceptable is sufficient to meet the statutory requirement." *White v. White*, Carroll Eq. No. 3, 1988 WL 101253, at *1 (Tenn.Ct.App. Oct. 3, 1988) (No Tenn.R.App.P. 11 application filed). Four years later, after the General Assembly changed the "cruel and inhuman treatment" ground to "inappropriate marital conduct,"[5] the Western Section of this court, following *White v. White*, upheld a divorce granted to a husband who had cared for his spouse during a long illness. The court found that the wife's conduct during the illness was "unacceptable" and had caused the husband "mental anguish and distress." *Brown v. Brown*, No. 02A01–9108–CV–00168, 1992 WL 5243, at *3 (Tenn.Ct.App. Jan.16, 1992) (No Tenn.R.App.P. 11 application filed).

---

**3.** Today, this sort of conduct would be considered to be domestic abuse. *See* Tenn.Code Ann. § 36–3–601(1) (Supp.1999).

**4.** *Shell v. Shell*, 34 Tenn. (2 Sneed) 716, 728–29 (1855).

**5.** *See* Tenn.Code Ann. § 36–4–101(11).

The trial court in this case brushed *Brown v. Brown* aside because it did not agree with the rationale of the decision.[6] We choose to side with our colleagues. It is not the Court of Appeals but the trial court who misperceives Tennessee's current public policy regarding divorces based on the ground of inappropriate marital conduct. Upon proof of any ground for divorce in Tenn.Code Ann. § 36–4–101, including inappropriate marital conduct, the General Assembly has empowered the courts to "grant a divorce to the party who was less at fault or, if either or both parties are entitled to a divorce, declare the parties to be divorced, rather than awarding a divorce to either party alone." Tenn.Code Ann. § 36–4–129(b) (Supp. 1999). Accordingly, a Tennessee court should grant a divorce from the bonds of matrimony whenever there is evidence of continued misconduct by one or both spouses that makes continued cohabitation unacceptable.

### B.

■ It remains to be decided whether Mr. Earls has proved by a preponderance of the evidence that between March 1997 and July 1998 either or both of the parties engaged in a repeated course of conduct that made continued cohabitation unacceptable. This inquiry is rendered less difficult because the parties have already decided for themselves—they have determined that cohabitation is no longer acceptable to them because they have been living apart since July 1998. The evidence in this case clearly demonstrates that both parties have engaged in conduct inappropriate in a marital relationship. Accordingly, the evidence overwhelmingly preponderates against the trial court's conclusions that "nothing that Ms. Earls did ... caused the break-up of the marriage" and that Ms. Earls was "waiting for this lawsuit to go away" before pursuing a reconciliation more aggressively.

The divorce question does not hinge on the fact that Ms. Earls was catastrophically injured in March 1997. Everyone involved with this case recognizes that neither Ms. Earls nor Mr. Earls is responsible for this misfortune. It does not even hinge upon Ms. Earls' efforts to rehabilitate herself or the progress of her rehabilitation despite the emphasis these matters received in the trial court.[7] The

---

**6.** The trial court explained that "I do not agree with what the Court of Appeals said in that case, because what the Court of Appeals did without the sanction of the Tennessee Supreme Court changed what all the inappropriate marital conduct and/or cruel and inhuman treatment cases had said for years just to say that cohabiting is not acceptable. Any series of misconduct flies in the face of all the prior law."

**7.** Both parties testified at some length about Ms. Earls' rehabilitation. Initially, Ms. Earls insisted that she did everything her healthcare givers told her to do, but later she conceded that she stopped her rehabilitation program for a period of time, that she declined to use certain apparatuses, and that she did not perform her home exercises. Mr. Earls also testified that Ms. Earls did not aggressively pursue the self-help activities and devices available to her. The trial court eventually decided that it was "estopped" to consider these facts because to do so would infringe on Ms. Earls' right of privacy protected by the Constitution of Tennessee. While the trial court's constitutional analysis is flawed, its conclusion is correct. Even though considering this evidence does not have constitutional overtones, the progress of Ms. Earls' rehabilitation is irrelevant to the issue of grounds for divorce except with regard to the conduct it may have caused the parties to engage in. Thus, Ms. Earls did not engage in inappropriate marital conduct by not seeking to rehabilitate herself more aggressively. However, both parties' frustrations over her injury and rehabilitation may have caused either or both of them to act in ways that were not appropriate for married couples.

decision regarding the existence of grounds for divorce depends upon the parties' conduct toward each other.

While Ms. Earls had no control over the fact that she was injured, she did have control over how she treated Mr. Earls. While it is understandable how she might be resentful and depressed about her condition, she could have refrained from taking her anger out on Mr. Earls or from throwing objects or from eventually becoming cold and bitter without expressions of affection or gratitude for his efforts. By the same token, Mr. Earls could have kept his frustration and anger in check. He too could have avoided the name-calling, the arguments, and the attitude that Ms. Earls was not trying hard enough to rehabilitate herself. As time passed, the parties' rancor grew, and the confrontations and arguments became more than isolated and infrequent incidents. The parties' disagreements escalated to the point where Mr. Earls' parents moved back home because they were no longer able to tolerate the atmosphere in the Earls' house. Thereafter, the rate of the disintegration of the parties' relationship accelerated as the burden of Ms. Earls' medical condition grew heavier and their external support diminished.

By the time the case reached the courts, both Mr. Earls and Ms. Earls had conceded that their differences were irreconcilable. Ms. Earls resisted Mr. Earls' divorce and did not seek a divorce of her own, not out of affection for Mr. Earls, but because she desired to avoid losing the health insurance provided by Mr. Earls' employer. Mr. Earls' group medical bene-fits should not have played a role in determining whether the parties should be divorced. While the courts should take the parties' desires into consideration, *see Turner v. Bell,* 198 Tenn. 232, 249, 279 S.W.2d 71, 79 (1955); *Lingner v. Lingner,* 165 Tenn. at 534, 56 S.W.2d at 752; *Herchenroeder v. Herchenroeder,* 28 Tenn.App. 696, 701, 192 S.W.2d 847, 849 (1945), they must ultimately render a decision called for by the law and the facts. Under the facts of this case, Ms. Earls' concern regarding her future medical care should have been addressed in the division of the marital estate and in spousal support and should not have influenced the decision on whether to grant a divorce.

When the trial court heard this case in March 1999, the parties' relationship had disintegrated and their love and affection had been extinguished. They had been separated for ten months with no effort or intention to rekindle their relationship. These circumstances had not changed when their lawyers argued the case before this court. Accordingly, the trial court should have found that both parties engaged in an inappropriate course of conduct over many months that rendered continued cohabitation as husband and wife unacceptable. On remand, the trial court shall enter an order declaring the parties divorced in accordance with Tenn.Code Ann. § 36–4–129(b).[8]

## II.

### CHILD CUSTODY

■ The trial court initially acceded to the parties' agreed-upon joint custody ar-

---

**8.** The trial court was evidently piqued at the testimony that Mr. Earls spat at his wife on one occasion, that he had pressured her into signing the marital dissolution agreement, and that he had kissed Ms. Moore on the mouth. Accordingly, the trial court stated that it would grant the divorce to Ms. Earls had she been seeking one. We do not quibble with the trial court's conclusion that Mr. Earls' "fault" exceeds Ms. Earls' "fault." But even conceding this point, the trial court could still have declared the parties divorced under Tenn.Code Ann. § 36–4–129(b) because the record clearly demonstrates that both parties contributed to the eventual disintegration of their marriage.

rangement with primary physical custody being awarded to Mr. Earls. However, the court changed its mind solely because it decided that the child was "jeopardized in the moral sense" because of Mr. Earls' relationship with Ms. Moore. Even taking into account the trial court's invocation of the parties' credibility, the totality of the evidence, considered objectively, indicates that the court has imbued this relationship with more significance than it deserves. Accordingly, we reverse the trial court's decision awarding custody to Ms. Earls.

### A.

Decisions involving custody and visitation are among the most important decisions in a divorce case. The courts must devise custody arrangements that promote the development of the children's relationship with both parents and interfere as little as possible with post-divorce family decision-making. *See Aaby v. Strange,* 924 S.W.2d 623, 629 (Tenn.1996); *Adelsperger v. Adelsperger,* 970 S.W.2d 482, 484 (Tenn.Ct.App.1997). These decisions are not intended to reward or to punish parents, *see Turner v. Turner,* 919 S.W.2d 340, 346 (Tenn.Ct.App.1995); *Barnhill v. Barnhill,* 826 S.W.2d 443, 453 (Tenn.Ct. App.1991), and, in fact, the interests of the parents are secondary to those of the children. *See Lentz v. Lentz,* 717 S.W.2d 876, 877 (Tenn.1986). The goal of these decisions is to promote the children's best interests by placing them in an environment that will best serve their physical and emotional needs. *See Luke v. Luke,* 651 S.W.2d 219, 221 (Tenn.1983).

No hard and fast rules exist for determining which custody and visitation arrangement will best serve a child's needs. *See Taylor v. Taylor,* 849 S.W.2d 319, 327 (Tenn.1993); *Dantzler v. Dantzler,* 665 S.W.2d 385, 387 (Tenn.Ct.App.1983). The inquiry is factually driven and requires the

courts to carefully weigh numerous considerations. *See Nichols v. Nichols,* 792 S.W.2d 713, 716 (Tenn.1990); *Rogero v. Pitt,* 759 S.W.2d 109, 112 (Tenn.1988); *Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn.Ct.App. 1983); *see also* Tenn.Code Ann. § 36–6– 106 (1996).

The comparative fitness analysis is not intended to ascertain which parent has been perfect because perfection is as unattainable in parenting as it is in life's other activities. *See Rice v. Rice,* 983 S.W.2d 680, 682–83 (Tenn.Ct.App.1998). Courts understand that parents have their own unique virtues and vices. *See Gaskill v. Gaskill,* 936 S.W.2d 626, 630 (Tenn.Ct.App. 1996). Accordingly, Tennessee's courts do not expect parents to prove that they are exemplary or that the other parent is completely unfit. Instead, they carefully consider the conduct and circumstances of the parents to determine which of the available custodians is comparatively more fit to have permanent custody of the child. *See Julian v. Julian,* No. M1997–00236–COA– R3–CV, 2000 WL 343817, *6 (Tenn.Ct.App. Apr. 4, 2000) (No Tenn.R.App.P. 11 application filed).

Since stability is important to any child's well-being, the courts have emphasized the importance of continuity of placement in custody and visitation cases. *See Taylor v. Taylor,* 849 S.W.2d at 328; *Contreras v. Ward,* 831 S.W.2d 288, 290 (Tenn.Ct.App. 1991). Continuity, however, does not trump all other considerations. Depending on the facts, a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child.

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to

second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *See D v. K,* 917 S.W.2d 682, 685 (Tenn.Ct.App.1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *See Nichols v. Nichols,* 792 S.W.2d at 716; *Doles v. Doles,* 848 S.W.2d 656, 661 (Tenn.Ct.App.1992).

## B.

The parties had already determined for themselves where their child's best interests lay. They knew that Ms. Earls could not care for the child on her own, and so they agreed that they should have joint custody with Mr. Earls being the custodial parent. They also agreed upon liberal visitation for Ms. Earls. They understood that this arrangement would require Mr. Earls to obtain help because he was continuing to hold down two jobs. Mr. Earls received this assistance from his mother and from Ms. Moore, a woman introduced by a mutual acquaintance following the parties' separation. Ms. Moore worked as a waitress in a Steak 'N Shake restaurant and had a son the same age as the parties' son. Ms. Earls was aware that Ms. Moore was taking care of her son and apparently did not object.

Ms. Moore and Mr. Earls were candid about their relationship. They had a good deal in common in that they were both trying to raise children on their own.

They both worked long hours and faced significant financial pressures. They decided that pooling their efforts would be mutually beneficial. Mr. Earls realized that Ms. Moore could help provide babysitting when he was working. Thus, when his mother could not assist him, Ms. Moore could come to his apartment when he left for work early in the morning and could oversee his son's morning routine before the child left for school.

These circumstances caused Mr. Earls and Ms. Moore to become close and to depend upon each other. They conceded that they had kissed on several occasions as Ms. Moore left the apartment.[9] Ms. Moore candidly stated that it "wasn't the right thing to be going on" and insisted that she had never been in Mr. Earls' bed and had never had sex with him. She also explained that their relationship would not advance further until after Mr. Earls was divorced. Ms. Moore disclosed that she had slept with her son on Mr. Earls' couch on several occasions when she had car trouble, but she insisted that she had not moved into Mr. Earls' apartment and that she did not keep any of her things there.

The trial court found Ms. Moore to be a "fairly credible and very honest" witness. Despite the absence of any other evidence in the record that Ms. Moore and her son had moved in with Mr. Earls, the trial court concluded that Ms. Moore was "living" with Mr. Earls. In the trial court's mind, therefore, the relationship between Mr. Earls and Ms. Moore would have provided Ms. Earls with sufficient grounds for a divorce had she sought one.[10] The trial

---

**9.** This testimony prompted the trial court to comment: "Why do people that are not married to each other kiss each other? I don't understand that. But go ahead, if you want to take that position."

**10.** The trial court stated: "As far as I judge what Ms. Moore had to say about y'all's relationship, [it] would give this court cause to grant her a divorce, that means Mrs. Earls, but she doesn't want one and I'm not going to grant a divorce for her. She hasn't asked for

court also concluded that it provided a basis for disregarding the parties' agreed upon custody arrangement that it had already approved, and for entering the quite unprecedented order permanently enjoining Mr. Earls from coming around Ms. Moore as long as he is married.[11]

The record does not contain one scintilla of evidence that Mr. Earls' relationship with Ms. Moore, whatever in truth it might be, has or will have an adverse impact on the parties' child. Considering the record objectively, Mr. Earls' relationship with Ms. Moore, born out of necessity, simply does not reflect on his ability to be his son's custodial parent. There being no substantial and material evidence in the record to require the trial court to second-guess the parties' own custody and visitation arrangement, we hold that the court erred by not approving the custody arrangement originally proposed by the parties. Accordingly, on remand, the trial court shall enter an order granting the parties joint custody of their son with primary physical custody in Mr. Earls.[12] Should Ms. Earls desire to change this custody arrangement, she will have the burden of proving that a material change

in her child's circumstances has occurred and that she is comparatively more fit than Mr. Earls to be the child's custodial parent.[13]

## III.

### SPOUSAL SUPPORT

Even though the trial court declined to declare the parties' divorced, it ordered Mr. Earls to pay Ms. Earls, as spousal support, $570 per month until her death. The court also directed Mr. Earls to pay all of Ms. Earls' accumulated medical expenses not covered by insurance and to be responsible for all her future uncovered medical expenses. These obligations, combined with Mr. Earls' other court-ordered obligations, far exceed his income. Accordingly, after considering the factors in Tenn.Code Ann. § 36–5–101(d)(1) (Supp. 1999), we have determined that the trial court's spousal support order must be modified.

### A.

There are no hard and fast rules for spousal support decisions. *See Crain v. Crain*, 925 S.W.2d 232, 233 (Tenn.Ct.App.

one, and she doesn't want one and the law doesn't require me to."

11. The trial court stated: "As long as these people [the Earls] remain married it morally jeopardizes this child to be exposed to Ms. Moore overnight with Mr. Earls in what is clearly at least on the surface to be perceived at this point in time to be a romantic situation. That's not good for ... [the child] to see that." Rather than simply addressing possible romantic overnight visits, the court barred Mr. Earls from all contact with Ms. Moore.

12. Following the entry of the order, Mr. Earls, as the custodial parent, will be entitled to receive the SSI payments for his son resulting from Ms. Earls' disability.

13. The trial court appears to have agreed with Ms. Earls' argument that she should be permitted to seek a modification in the custody

arrangement whenever she decides that her physical condition has improved enough to enable her to take care of the parties' child. However, an improvement in Ms. Earls' condition is not, as a matter of law, a changed circumstance that will warrant reopening the issue of custody. Changed circumstances must involve the child's circumstances rather than those of the non-custodial parent. *See White v. White*, No. M1999–00005–COA–R3–CV, 1999 WL 1128840, at *3 (Tenn.Ct.App. Dec. 10, 1999) (No Tenn.R.App.P. 11 application filed); *McCain v. Grim*, No. 01A01–9711–CH–00634, 1999 WL 820216, at *2 (Tenn.Ct. App. Oct. 15, 1999) (No Tenn.R.App.P. 11 application filed); *Gorski v. Ragains*, No. 01A01–9710–GS–00597, 1999 WL 511451, at *4–5 (Tenn.Ct.App. July 21, 1999) (No Tenn. R.App.P. 11 application filed).

1996); *Stone v. Stone,* 56 Tenn.App. 607, 615–16, 409 S.W.2d 388, 392–93 (1966). Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount, and duration. *See Garfinkel v. Garfinkel,* 945 S.W.2d 744, 748 (Tenn.Ct.App.1996); *Jones v. Jones,* 784 S.W.2d 349, 352 (Tenn.Ct.App. 1989). Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes. *See Brown v. Brown,* 913 S.W.2d 163, 169 (Tenn.Ct.App.1994); *Ingram v. Ingram,* 721 S.W.2d 262, 264 (Tenn.Ct.App.1986).

Tenn.Code Ann. § 36–5–101(d)(1) (Supp. 1999) reflects a preference for temporary, rehabilitative spousal support, as opposed to long-term support. *See Herrera v. Herrera,* 944 S.W.2d 379, 387 (Tenn.Ct. App.1996); *Wilson v. Moore,* 929 S.W.2d 367, 375 (Tenn.Ct.App.1996). The purpose of rehabilitative support is to enable the disadvantaged spouse to acquire additional job skills, education, or training that will enable him or her to be more self-sufficient. *See Smith v. Smith,* 912 S.W.2d 155, 160 (Tenn.Ct.App.1995); *Cranford v. Cranford,* 772 S.W.2d 48, 51 (Tenn.Ct.App. 1989). The purpose of long-term spousal support, on the other hand, is to provide support to a disadvantaged spouse who is unable to achieve some degree of self-sufficiency. *See Loria v. Loria,* 952 S.W.2d 836, 838 (Tenn.Ct.App.1997). The statutory preference for rehabilitative support does not entirely displace other forms of spousal support when the facts warrant long term or more open-ended support. *See Aaron v. Aaron,* 909 S.W.2d 408, 410 (Tenn.1995); *Isbell v. Isbell,* 816 S.W.2d 735, 739 (Tenn.1991).

Even though fault is a relevant consideration when setting spousal support, *see* Tenn.Code Ann. § 36–5–101(d)(1)(K), these decisions are not intended to be punitive. *See Duncan v. Duncan,* 686 S.W.2d 568, 571 (Tenn.Ct.App.1984); *McClung v. McClung,* 29 Tenn.App. 580, 584, 198 S.W.2d 820, 822 (1946). The purpose of spousal support is to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce. *See Shackleford v. Shackleford,* 611 S.W.2d 598, 601 (Tenn.Ct.App.1980). While divorced couples often lack sufficient income or assets to enable both of them to retain their pre-divorce standard of living, *see Brown v. Brown,* 913 S.W.2d at 169, the obligor spouse may be able to provide some "closing in money" to enable the disadvantaged spouse to approach his or her former financial condition. *See Aaron v. Aaron,* 909 S.W.2d at 411.

Spousal support decisions hinge on the unique facts of the case and require a careful balancing of the factors in Tenn. Code Ann. § 36–5–101(d)(1). *See Hawkins v. Hawkins,* 883 S.W.2d 622, 625 (Tenn.Ct.App.1994); *Loyd v. Loyd,* 860 S.W.2d 409, 412 (Tenn.Ct.App.1993). In virtually every case, the two most important factors are the demonstrated need of the disadvantaged spouse and the obligor spouse's ability to pay. *See Varley v. Varley,* 934 S.W.2d 659, 668 (Tenn.Ct.App. 1996); *Crain v. Crain,* 925 S.W.2d at 234.

### B.

■ We have here a marriage of relatively short duration. While the parties were wed, they made ends meet by holding down three jobs between them. Following Ms. Earls' illness and the parties' separation, their combined needs quickly outstripped the resources available to them. Support decisions are seldom easy, and they are certainly rendered more diffi-

cult when there are legitimate needs and insufficient resources.

Mr. Earls paid Ms. Earls $211 per month in temporary support prior to the divorce decree. At trial, Mr. Earls proposed to continue this support; while Ms. Earls suggested that she should be responsible for her accrued and future medical expenses and, in return, that Mr. Earls should pay her $570 per month. Not only did the trial court order Mr. Earls to pay $570 per month in spousal support, but it also required him to be responsible for Ms. Earls' future uncovered medical expenses plus $14,878 in accrued medical expenses.[14]

Beyond doubt Ms. Earls needs financial support. Her injury has left her completely disabled, and the prospects for significant rehabilitation are remote. Her monthly government disability checks in the amount of $648 are her only current source of income other than the assistance she receives from her mother and stepfather. At the same time, Mr. Earls' net monthly income—approximately $1,640—is modest. In light of our modification of the trial court's custody decision, Mr. Earls will be required to support himself and the parties's child on this income plus the $323 monthly SSI payments which must be used for the child.

■ We have determined that Mr. Earls should pay short-term spousal support. Based on the length of the marriage, Ms. Earls' needs, Mr. Earls' ability to pay, as well as the fact that he will assume primary responsibility for raising the parties' child, we have determined that

Mr. Earls should pay Ms. Earls support in the amount of $450 per month from April 6, 1999 through March 31, 2006. Neither the amount nor duration of this support shall be modified or extended. We have also determined that Mr. Earls should continue to pay the $144 monthly premium for Ms. Earls' COBRA insurance coverage as long as it is available and that Mr. Earls shall receive a credit against his monthly support obligation for these payments as long as he makes them. Finally, we have determined that Mr. Earls should shoulder the responsibility for paying the balance of Ms. Earls' uncovered medical expenses that had accrued at the time of the trial not to exceed $10,578.[15] On remand, the trial court shall enter a support order consistent with this opinion. In addition to establishing Mr. Earls' spousal support obligation prospectively, the order shall give Mr. Earls credit for any spousal support payments made since April 6, 1999 that exceed the amount of the support established by this opinion.

## IV.

### THE AWARD OF ATTORNEY'S FEES

■ Mr. Earls also takes issue with the trial court's decision to require him to pay Ms. Earls an additional $4,000 to defray her legal expenses. He asserts that he is unable to pay these expenses. Ms. Earls responds that she has no assets from which she can pay these expenses and that her condition renders her unable to generate additional income. She also requests this court to order Mr. Earls to pay the

---

14. The accrued expenses were being repaid in monthly installments of $650 over eighteen months.

15. These expenses amounted to $14,878 at the time of trial. In its final judgment, the trial court awarded Ms. Earls the $4,300 that had been paid into court and directed her to

use these funds to reduce the amount of these unpaid expenses. We affirm the trial court's disposition of the funds paid into court. By applying these funds to the accrued medical expenses, Mr. Earls' liability of the accrued but unpaid medical expenses will be capped at $10,578.

legal expenses she has incurred as a result of this appeal.

In a divorce action, an award of attorney's fees is treated as additional spousal support. *See Smith v. Smith,* 912 S.W.2d 155, 161 (Tenn.Ct.App.1995); *Gilliam v. Gilliam,* 776 S.W.2d 81, 86 (Tenn.Ct.App. 1988). The decision to award attorney's fees lies within the sound discretion of the trial judge, *see Aaron v. Aaron,* 909 S.W.2d at 411; *Brown v. Brown,* 913 S.W.2d at 170, and we will not interfere with the trial judge's decision unless the evidence preponderates against it. *See Batson v. Batson,* 769 S.W.2d 849, 862 (Tenn.Ct.App.1988). A party is entitled to attorney's fees when he or she lacks sufficient funds to pay his or her legal expenses or would be required to deplete other assets to do so. *See Brown v. Brown,* 913 S.W.2d at 170; *Kincaid v. Kincaid,* 912 S.W.2d 140, 144 (Tenn.Ct. App.1995).

The record leaves little room for doubt that Ms. Earls currently lacks the resources to pay her lawyer and that her future income from all sources will barely cover her necessities. It is equally clear that Mr. Earls has few existing assets and that his income is modest when measured against his future obligations. However, Mr. Earls' ability to earn income and to accumulate assets is far superior to Ms. Earls'. Accordingly, we have no basis to second-guess the trial court's decision to require Mr. Earls to pay Ms. Earls $4,000 for her legal expenses. However, we have determined that it would be appropriate to permit Mr. Earls, at his election, to pay this amount in a lump sum or in installments over two years from the date of the

entry of the mandate in this case. We have also determined that Mr. Earls should not be required to pay the legal expenses Ms. Earls has incurred as a result of this appeal.

## V.

### Mr. Earls' Association with Ms. Moore

One final issue requires discussion. In light of the evidence regarding Mr. Earls' relationship with Ms. Moore, the trial court permanently enjoined Mr. Earls from "coming around" Ms. Moore as long as he is married. The trial court's explanation for this astonishing decision is that it did not believe it "to be in the best interest of this marriage for you Mr. Earls to continue this relationship with Ms. Moore." As the court saw it, the injunction would "promote and protect the marriage relationship which exists and will exist in this case until I am reversed or something new comes before the court." At Mr. Earls' request, we stayed this order while this appeal was pending.

Courts may appropriately consider a custodial parent's non-marital sexual activities in the context of a custody decision. *See Lance v. Lance,* No. 01A01–9801–CV–00036, 1998 WL 748283, at *3 (Tenn.Ct. App. Oct. 28, 1998) (No Tenn.R.App.P. 11 application filed); *Barnhill v. Barnhill,* 826 S.W.2d at 453. However, we have repeatedly pointed out that cohabitation alone does not necessarily provide grounds for changing custody when there is no proof that it has or will adversely affect the children. *See Varley v. Varley,* 934 S.W.2d at 666–67; *Sutherland v. Sutherland,* 831 S.W.2d 283, 286 (Tenn.Ct. App.1991).[16] In order to shield young, im-

---

16. *See also Williams v. Williams,* No. 01A01–9610–CV–00468, 1997 WL 272458, at *6–7 (Tenn.Ct.App. May 23, 1997) (No Tenn. R.App.P. 11 application filed); *Salimbene v. Salimbene,* No. 87–194–II, 1987 WL 27748, at

*1 (Tenn.Ct.App. Dec.16, 1987) (No Tenn. R.App.P. 11 application filed); *Smith v. Smith,* No. 86–43–II, 1986 WL 7621, at *2 (Tenn.Ct.App. July 9, 1986) (No Tenn. R.App.P. 11 application filed) (reversing a de-

pressionable children from these sorts of activities, the courts frequently enjoin the parents from engaging in intimate sexual activities while the children are present. The trial court's injunction in this case, however, far exceeds the customary remedies for non-marital sexual conduct.

No party on appeal has undertaken to defend this portion of the final order. We are not surprised because the order marks the first time that a trial court has enjoined a party from associating with another person even when the children are not present. The order cannot stand for three reasons. First, the record contains absolutely no proof that Mr. Earls' relationship with Ms. Moore, whatever it is, has adversely affected or is likely to adversely affect the parties' child. Second, the order infringes on Mr. Earls' constitutionally protected right to associate with persons of his own choosing. Third, the rationale for the injunction—the trial court's notion that the parties would reunite if Ms. Moore was out of the picture—is no longer relevant because we have directed the trial court, on remand, to enter an order declaring the parties divorced. Thus, as a matter of law, there is no longer a marriage to be preserved. Accordingly, the trial court's injunction preventing Mr. Earls from associating with Ms. Moore while he is married is dissolved.

## VI.

In summary, we reverse the portions of the April 6, 1999 final judgment in which the trial court (1) declined to divorce the parties, (2) awarded custody of the parties' child to Ms. Earls and ordered Mr. Earls to pay child support, (3) directed Mr. Earls to pay $570 per month in permanent alimony, and (4) ordered Mr. Earls to refrain from associating with Ms. Moore. We re-

mand the case to the trial court with directions to enter an order consistent with this opinion (1) declaring the parties divorced in accordance with Tenn.Code Ann. § 36–4–129(b), (2) awarding the parties joint custody of their child with Mr. Earls receiving primary physical custody, and (3) directing Mr. Earls to pay Ms. Earls $450 in spousal support in accordance with Section III of this opinion. We tax the costs in equal proportions to Clark Matthew Earls and his surety and to Shirley Ann Earls for which execution, if necessary, may issue.

COTTRELL, J., filed a concurring opinion.

CAIN, J., filed a dissenting opinion.

Judge COTTRELL concurring.

This case involves a tragic and troubling fact situation, but, in my opinion, does not involve any fundamental issue of law or policy. Our task lies in applying the facts herein to established principles. The primary issue in this appeal is not whether Tennessee law recognizes true no-fault divorce. The answer to that question is clearly no, except in two situations not present in this case. Similarly, this case is not about the courts' role in preserving the sanctity of marriage. These parties do not have and do not want a marital relationship. I have joined in Judge Koch's conclusions regarding the issues raised herein, but write separately on two issues.

### I. Divorce

The issue before us is whether the evidence in this case demonstrates sufficient inappropriate marital conduct to authorize a grant of divorce. I agree with Judge Koch that Tenn.Code Ann. § 36–4–129(b) (Supp.1999) authorizes a court to declare

---

cision to remove two children from the custody of a mother who admitted to having sexual

relations with four different men during the first three years following the divorce).

the parties divorced, regardless of which party may be more at fault, when there is proof that would entitle either or both parties to a divorce, i.e., proof of one of the statutory grounds for divorce.

This is the question upon which the majority and dissent diverge-whether the record includes proof of inappropriate marital conduct. As detailed in Judge Koch's opinion, the courts' view of the type of conduct which constitutes cruel and inhuman treatment in a marriage has evolved, as has society's view of marriage and the individual's role in marriage. While there appears to be some lack of unanimity in appellate decisions on the specific words to be applied in defining inappropriate marital conduct, the basic question remains whether either or both of the parties engaged in a course of conduct which (1) caused pain, anguish or distress to the other party and (2) rendered continued cohabitation "improper," "unendurable," "intolerable" or "unacceptable." *See* Tenn. Code Ann. § 36–4–101(11) (Supp.1999); *Gardner v. Gardner*, 104 Tenn. 410, 412, 58 S.W. 342, 343 (1900); *Garvey v. Garvey*, 29 Tenn.App. 291, 299–300, 203 S.W.2d 912, 916 (1946); *White v. White*, Carrol Eq. No. 3, 1988 WL 101253 at *1 (Tenn.Ct. App. Oct. 3, 1988) (no Tenn.R.App.P. 11 application ·filed); *Brown v. Brown*, No. 02A01–9108–CV–00168, 1992 WL 5243 at *3 (Tenn.Ct.App. Jan. 16, 1992) (no Tenn. R.App.P. 11 application filed). Over twenty-five years ago, this court recognized as inappropriate marital conduct the everyday treatment of a spouse "by which love, the vital principle which animates a marriage, is tortured to death; with the result that the once happy joinder becomes nothing less than a 'bridge of groans across a stream of tears.'" *Newberry v. Newberry*, 493 S.W.2d 99, 101 (Tenn.Ct.App.1973).

Recognizing that any marital relationship is the result of a unique set of com-promises and a unique combination of the individual sensitivities, expectations, and personalities of the parties involved, it is understandable that judges may differ on whether particular conduct has caused unnecessary suffering to a particular individual and rendered a particular marital relationship unsustainable. My position is simply that a judge need not substitute his or her opinion for that of the parties where, as here, both parties have determined that the other spouse's conduct has made continued cohabitation improper, unendurable, intolerable or unacceptable to themselves. The evidence herein is clear, and statements at oral argument unequivocal, that neither party has any intention, hope, or desire to live with the other or to re-establish or maintain a marital relationship. Both parties' actions and statements establish the undisputed fact that their prior conduct toward each other has caused pain and distress such that each party has determined that cohabitation is improper, unendurable, and unacceptable. Therefore, I would find that the evidence preponderates against the trial court's finding that inappropriate marital conduct was not proved.

I agree with Judge Koch that both parties engaged in conduct which contributed to the deterioration of their marriage. I disagree with Judge Cain's position that our task is to determine the precipitating cause of the decline and assign responsibility for it to one of the parties. The parties herein were faced with a devastating occurrence caused by neither party. While they attempted to cope with its effects, they were unsuccessful in maintaining an intact marital relationship. Their perceptions of the other spouse's behavior or attitude, whether those perceptions were accurate or not, resulted in conduct toward each other by which their love was "tortured to death" and their marriage became a "bridge of groans across a stream of

tears." As sad as this truth is, it accomplishes nothing for the judicial system to attempt to determine who was more at fault between these two parties who have already suffered enough. The legislature has determined that we are not required to. *See* Tenn.Code Ann. § 36–4–129(b) (Supp.1999).

## II. Custody

The practical effect of both Judge Cain's and Judge Koch's opinions is to leave primary physical custody of the parties' child with the father, where it has been since the parties separated in July of 1998. Neither of my colleagues and neither of the parties dispute the inappropriateness of the trial court's award of custody to the mother, who did not ask for custody. The trial court accepted the parties' agreement, leaving the parties to believe there was no necessity to put on proof relevant to custody. Obviously, this award must be vacated.

Judge Cain would leave in effect the current situation which resulted from agreement by the parties. The result would be no initial award of custody incident to the divorce. Judge Koch would hold that the trial court erred in not approving the custody arrangement proposed by the parties and approved by the court at the beginning of the trial. Thus, he would award joint custody, with primary physical custody in the father.

In the interest of providing stability in placement to the child, this court has consistently cautioned against temporary custody decisions by lower courts and urged prompt resolution of custody matters. *See, e.g., Smithson v. Eatherly,* No. 01A01–9806–CV–00314, 1999 WL 548586 at *3 (Tenn.Ct.App. July 29, 1999) (no Tenn. R.App.P. 11 application filed). In furtherance of those principles, rather than leave in question the legal status of the current arrangement, I would award custody in accordance with the trial court's original ruling, which decreed the arrangement agreed to by the parties, since we have vacated the court's final ruling.

Under either the majority or dissenting opinion, some action by the mother would be necessary to re-open the issue of custody. Under Judge Cain's opinion, the mother would be allowed to raise the issue of custody by amending her pleadings, pursuant to Tenn.R.Civ.P. 15.[1] Since that would trigger an initial award, the court would use a comparative fitness analysis. Under the majority opinion, the mother would need to seek a modification of the custody award under the legal standards applicable to such proceedings.[2] Judge Cain is concerned that the majority's ruling would deprive the mother of the bene-

---

1. There is nothing in the record to indicate that the mother has any intention of requesting primary or sole custody until her physical condition has improved. In fact, her last filing stated:

   Pursuant to the parties' stipulation, custody shall be awarded jointly to the parties with primary physical care of Sage to be with Husband. However, because of Wife's physical disability, in the event she is able to rehabilitate herself to the point that she can physically take care of Sage, Wife will have the right to request the Court to review custody using a comparative fitness analysis so that Wife's improved health would be a material change in circumstances.

2. A party seeking to modify a custody arrangement must demonstrate that the child's circumstances have materially changed, and that modification is in the best interest of the child. *See Adelsperger v. Adelsperger,* 970 S.W.2d 482, 485 (Tenn.Ct.App.1997). The changes must not have been reasonably anticipated at the time of the previous custody order. *See Blair v. Badenhope,* 940 S.W.2d 575, 576 (Tenn.Ct.App.1997)

fit of the bargain she made in agreeing to the stipulation. I disagree.

The requirement that a change of custody would be considered only upon the mother's filing a request for modification is consistent with the parties' stipulation. However, the goal of the stipulation, from the mother's perspective, was to eliminate the requirement that she prove that an unforeseeable change of circumstances had occurred since the award by the parties' agreement that her improved health would constitute a change of circumstances. Whether the stipulation, as drafted, would have been effective to accomplish her goal is not clear. In my opinion, however, that is an issue we need not address at this time. The mother was represented by counsel throughout and was willing to live with the stipulation, whether it would eventually accomplish what she wanted or not, when it was entered.[3] Therefore, unlike Judge Cain, I do not think she would be deprived of the benefit of her agreement by an award of primary custody to the father. Unlike Judge Koch, I see no reason for us to rule on the stipulation or on the standard to be applied to any request for custody modification until those issues are presented in the context of a modification proceeding.

In effect, I concur with Judge Koch in the award of joint custody with primary physical custody to the father, but would leave the issue of mother's burden, if she later seeks a modification of this arrangement, for determination in that proceeding.

Judge CAIN dissenting.

I respectfully dissent from the holding of the court that the record in this case pro-

vides any basis for granting Mr. Earls a divorce from Ms. Earls on fault-based grounds, including simply declaring the parties divorced under Tennessee Code Annotated section 36–4–129(b)(Supp.1999) which itself is fault-based. The trial court refused to grant such divorce and on Tenn. R.App.P. Rule 13(d) review in this court, the evidence not only does not preponderate against the findings of fact of the trial court but rather strongly supports the trial court action.

I. The Issues Drawn by the Pleadings

Mr. Earls' complaint of July 17, 1998 sought divorce only on grounds of irreconcilable differences pursuant to Tennessee Code Annotated section 36–4–101(11). Filed with the complaint was a marital dissolution agreement ("MDA") executed by the parties on July 16, 1998. On August 5, 1998, Ms. Earls filed her answer and counter-claim disavowing the MDA and asserting that same had been procured by undue influence of Mr. Earls at a time when she was under duress. She prayed for neither divorce nor legal separation but only a declaration that the MDA was ineffective, that Mr. Earls be required to keep her insured under his health insurance policy with his employer and that he be enjoined from dissipating marital assets. She further asked for temporary support, alimony in futuro, reasonable attorney fees and general relief.

On August 13, 1998, Mr. Earls filed a motion for leave to amend his complaint stating: "In support, Plaintiff would show that he filed for divorce on the grounds of irreconcilable differences and that his Wife

---

**3.** Had the trial court not later changed its mind regarding custody, we would have before us the stipulation as the order of the court, and presumably no party would be challenging a disposition which reflected their agreement. The interpretation and effectiveness of the stipulation would simply not be relevant unless and until the mother sought, in a later proceeding, a modification of custody.

signed a marital dissolution agreement but has asked this court to void the agreement, so that it is necessary for Plaintiff to allege additional grounds." On August 13, 1998, Mr. Earls filed his answer to the counter-complaint therein asserting the validity of the MDA, denying that Ms. Earls was unable to be gainfully employed, and making the following assertion: "Husband would show that Wife refuses to help herself, refuses to do the exercises prescribed her, and would further show that Wife can walk with the aid of a walker, and can work a computer. Husband would show that Wife is apparently depressed and does not want to improve despite Husband's best efforts in helping Wife."

On August 26, 1998, the parties filed an agreed order providing leave to Mr. Earls to amend his complaint, enjoining Mr. Earls from removing Ms. Earls from his health insurance policy and providing that Mr. Earls should account for all monies in the safe deposit box and that he would deposit the remaining $4,300 therein located into the registry of the court pending further orders of the court. This order further provided that Mr. Earls would pay temporary alimony of $211 per month with Mr. Earls continuing to be responsible for joint debts and Mr. Earls retaining the monthly social security checks for the minor son of the parties.

On December 14, 1998, Mr. Earls filed his amended complaint asserting in part:

1. The parties' [sic] have one minor child, Sage, and Husband is the fit and proper person to have custody of the parties' minor child. Although Wife is disabled, she is capable of some employment and is capable of rehabilitating herself, and will be able to provide child support at some future time.

2. Wife is guilty of inappropriate conduct causing the breakup of the marriage. After Wife's injury, she had op-portunity to help herself heal, but instead refused help, refused therapy, and even quit occupational therapy. Husband took family leave from his employment to assist in Wife's recovery, and Husband's mother even moved in with the parties to help. Wife refused to assist herself, refused to do the exercise necessary for her to regain her health, and caused the breakdown of the marriage.

In this amended complaint, Mr. Earls sought absolute custody of the minor child with reasonable visitation for Ms. Earls. In addition, he sought an absolute divorce from Ms. Earls.

The parties entered into an oral stipulation that they would have joint custody of the minor child with Mr. Earls having primary physical custody. This stipulated custody arrangement was implemented by the parties. Ms. Earls answered the amended complaint of Mr. Earls on December 17, 1998. Specifically, in response to paragraph one of the amended complaint relative to custody, she asserted: "Based upon the stipulation entered into by the parties regarding custody, there is no further need to respond to the averment." In this answer to the amended complaint, Ms. Earls sought only that Mr. Earls' complaint be dismissed and that she be awarded attorney fees and expenses.

On March 10, 1999, after the first day of the trial of this case, Ms. Earls filed a document entitled "Wife's Prayer for Relief." Ms. Earls sought child support, alimony in futuro and the dismissal of Mr. Earls' complaint. She requested weekend-long visitation each weekend and nightly phone visitation. This document also made the following request:

2. Pursuant to the parties' stipulation, custody shall be awarded jointly to the parties with primary physical care of Sage to be with Husband. However,

because of Wife's physical disability, in the event she is able to rehabilitate herself to the point that she can physically take care of Sage, Wife will have the right to request the court to review custody using a comparative fitness analysis so that Wife's improved health would be a material change in circumstances.

## II. The Evidence in the Case

As the majority opinion appropriately reflects, this record taken as a whole shows two decent young people trying desperately to cope with a personal tragedy so overwhelming that no court, trial or appellate, can but feel its own inadequacy. The case for Mr. Earls consists almost entirely of his own testimony and the testimony of his mother. He testified that his stress in this difficult situation was compounded by frustration because Ms. Earls did not follow the advice of her therapists, did not use prescribed exercises or devices and did not practice her walking. After a year and a half of attending to Ms. Earl's needs, Mr. Earls was just "full up to here." Mr. Earls states that Ms. Earls could not apparently overcome her anger about her injury, and she was silent, noncommunicative, resentful and cold toward Mr. Earls. As time passed both parties became frustrated with arguments and name calling. In June of 1998, Mr. Earls employed Laura Moore as a babysitter. Shortly thereafter, he developed a relationship with her that he asserts unpersuasively did not include ultimate intimacy.

Ms. Earls, in her testimony, confirms many of the frustrations felt by Mr. Earls and acknowledges the extent to which her husband tried to help her. She denies that she failed to try to facilitate her own recovery but asserts that she did the best she could in her therapy. She acknowledges that she became depressed but denies any conduct which could put her at fault for the breakup of the marriage of the parties.

Missing from this record is the testimony of any doctor, nurse, therapist, or occupational recovery specialist to establish the alleged deficiencies in Ms. Earls' efforts to promote her own recovery, or in establishing the extent to which her recovery is possible. The case for Mr. Earls is predicated entirely on his own subjective observations and those of his mother.

## III. The Judgment of the Trial Court

Final judgment was entered in the trial court on April 6, 1999. The trial court held that Mr. Earls had failed to carry his burden of proof that Ms. Earls had been guilty of inappropriate marital conduct. The court further held, in spite of the stipulation of the parties at the outset of the trial to the contrary, that custody of the minor child should be vested in Ms. Earls. The court further ordered Mr. Earls to maintain the existing health insurance coverage on Ms. Earls, pay $570 per month alimony in futuro, and all uncovered future medical expenses. The court further held: "9. Plaintiff shall be permanently enjoined from bringing Sage around Laura Moore or having Laura Moore present during his visitation. In addition, Plaintiff is permanently enjoined from coming around Laura Moore as long as he is married." From this judgment, Mr. Earls appeals.

## IV. Divorce

In his first issue on appeal, Appellant asserts "the trial court erred in failing to grant a divorce to Mr. Earls based on inappropriate marital conduct." In denying a divorce to Mr. Earls, the trial court asserted a belief that there could be a reconciliation between the parties. With all deference to the trial judge, this record establishes no reasonable hope for recon-

ciliation. The marriage between these parties is "irretrievably broken" and two questions must be answered:

1. Does the evidence establish "fault" on the part of Ms. Earls so as to entitle Mr. Earls to a divorce for her inappropriate marital conduct?

2. Can a divorce be granted to Mr. Earls without finding Ms. Earls to be at fault?

The Tennessee Code recognizes no-fault divorce only in the context of "irreconcilable differences" under section 36–4–101(14) and two years separation under section 36–4–101(15). Tenn.Code Ann. §§ 36–4–101(14), (15) (Supp.1999). No divorce can be granted on grounds of irreconcilable differences without a sworn agreement of the parties settling all matters of custody and property with such agreement approved by the court. Tenn. Code Ann. § 36–4–103(b) (Supp.1999). In addition, the code provides as follows:

(e) If there has been a contest or denial of the grounds of irreconcilable differences, no divorce shall be granted on the grounds of irreconcilable differences. However, a divorce may be granted on the grounds of irreconcilable differences where there has been a contest or denial, if a properly executed marital dissolution agreement is presented to the court.

TennCode Ann. § 36–4–103(e) (Supp.1999).

In the case at bar, the trial court has refused to approve the MDA, and the record establishes no abuse of discretion in this refusal. Also, the "irreconcilable differences" grounds for divorce were strenuously contested. It is likewise clear that the two years continuous separation provision of section 36–4–101(15) is applicable only if there are no minor children of the parties.

Since no basis exists in this case for a divorce on irreconcilable differences, Mr. Earls is left with his assertion of inappropriate marital conduct. Section 36–4–101(11) of the Code provides for a divorce based upon finding of fault where "the husband or wife is guilty of such cruel and inhuman treatment or conduct towards the spouse as render cohabitation unsafe and improper which may also be referred to in pleadings as inappropriate marital conduct." In a divorce case based upon allegations of fault, the burden rests upon the plaintiff to establish grounds of divorce by a preponderance of the evidence. If the proof fails to satisfy the chancellor that plaintiff is entitled to a divorce, such finding is reviewable on appeal de novo with a presumption of correctness of the decree of the chancellor. *Greene v. Greene,* 48 Tenn.App. 636, 641, 349 S.W.2d 186, 189 (1960).

Tennessee has moved dramatically in recent years, both by legislative enactment and judicial pronouncement, away from fault-based grounds for divorce and ever closer to no-fault divorce. *See Cary v. Cary,* 937 S.W.2d 777, 781 (Tenn.1996). However, the General Assembly, which has primary responsibility for determining the public policy of Tennessee, has yet to adopt no-fault divorce except to the limited degree authorized in two situations: where there are irreconcilable differences accompanied by a complete marital dissolution agreement and, in the case of a marriage with no minor children, after two years of separation. In the absence of one of these grounds stipulated pursuant to section 36–4–129, proof of fault grounds is still required. Tenn.Code Ann. § 36–4–114 (1996); *see Warren v. Warren,* 731 S.W.2d 908 (Tenn.Ct.App.1985).

The Supreme Court of Tennessee long ago recognized the inherent weakness of fault-based divorce laws in cases where

inability to prove fault leads to the continuation of a marriage in name only. In 1933, speaking for the Supreme Court, Chief Justice Grafton Green observed:

> As pointed out by another court, we must take into consideration "the mischiefs arising from turning out into the world, in enforced celibacy, persons who are neither married nor unmarried." *Burlage v. Burlage*, 65 Mich. 624, 32 N.W. 866, 867. Society is not interested in perpetuating a status out of which no good can come and from which harm may result.

*Lingner v. Lingner*, 165 Tenn. 525, 56 S.W.2d 749, 752 (1933). In *Lingner*, however, the wife had sued only for divorce from bed and board and not for absolute divorce, and the court in granting her an absolute divorce over her objections applied code section 8445, now Tennessee Code Annotated section 36–4–120(b). *Lingner* has repeatedly been followed in cases where a party has attempted to limit relief to divorce from bed and board and the court has determined that the marriage is a marriage in name only. *See, e.g., Turner v. Bell*, 198 Tenn. 232, 279 S.W.2d 71 (1955); *Herchenroeder v. Herchenroeder*, 28 Tenn.App. 696, 192 S.W.2d 847 (1945).

Prior to chapter 283 of the Public Acts of 1963, Tennessee Code Annotated section 36–802 provided grounds for divorce from bed and board on grounds of cruel and inhuman treatment, intolerable indignities to the person, and abandonment. Chapter 283 provided power to the court to grant an absolute divorce where a final decree of divorce from bed and board had been in effect for two years with no reconciliation between the parties. This brought on the *Abney* saga beginning with *Abney v. Abney*, 222 Tenn. 160, 433 S.W.2d 847 (1968). After Ms. Abney obtained a divorce from bed and board in 1964, her husband, Mr. Abney, filed a petition in 1967 under chapter 283 of the Public Acts of 1963, asking the court to grant an absolute divorce either to him or to Ms. Abney. Said the supreme court:

> We think the paramount intent of the legislature in enacting this 1963 amendment to this Code section can be found in statements made by Chief Justice Green in *Lingner v. Lingner*, 165 Tenn. 525, 56 S.W.2d 749 (1933). Chief Justice Green, after noting that a person living under a decree of limited divorce is in effect living in a world of enforced celibacy, neither married nor unmarried, said:
>
> > Society is not interested in perpetuating a status out of which no good can come and from which harm may result. 165 Tenn. at 534, 56 S.W.2d at 752.
>
> The intent of this amendment is to empower the courts to grant relief to persons finding themselves in such a situation.

*Abney*, 433 S.W.2d at 849.

Thereafter, in construing the language of the 1963 amendment, the Supreme Court in *Abney* reiterated *Lingner* but held:

> Under the first ground of the demurrer the wife, in effect, says she does not seek an absolute divorce. In a divorce action the desires of the parties, particularly the party without fault, are given consideration but such does not control the action of the court. *Lingner v. Lingner*, supra. The first ground of the demurrer is without merit.
>
> The husband sought relief either by the court granting to him or to his wife an absolute divorce. This petition was filed as a result of two years expiring since the decree awarding the wife separate maintenance. Under this petition the court has no authority to award the

husband a divorce. The decree awarding the wife separate maintenance can be changed to award the wife an absolute divorce. The demurrer insofar as it applies to the husband seeking a divorce is sustained. Otherwise, the judgment of the court is reversed and the cause remanded for further proceedings.

*Abney,* 433 S.W.2d at 850.

The *Abney* battle over the 1963 amendment to Tennessee Code Annotated section 36–802 continued, and after again being rebuffed in the trial court, James Harold Abney appealed to this court which held in part as follows:

The 1963 amendment to § 36–802 T.C.A. did create additional circumstances under which the courts in their discretion were empowered to grant absolute divorces, but when granted under the provisions of this amendment, such divorces must be granted to the same person who obtained the original relief. *Abney v. Abney,* Tenn., [222 Tenn. 160] 433 S.W.2d 847 (1968)....

. . .

Defendant protests bitterly that he is immured in the thralldom of enforced celibacy as deplored in *Lingner v. Lingner,* 165 Tenn. 525, 56 S.W.2d 749 (1932 [1933] ). This may be true, but, according to the testimony of the parties, it is defendant who is unwilling to cohabit with his wife, rather than the reverse. In this respect, celibacy of defendant is voluntary, rather than enforced.

. . .

The 1963 amendment to § 36–802, T.C.A. was largely aimed at those situations wherein the so-called "guilty party" was willing to be reconciled and the so-called "innocent party" declined to become reconciled. Although not limited to such situations, it is extremely doubtful that the legislature intended to provide a means whereby a wrongdoer might force an unwanted divorce upon the innocent spouse by persistence in wrong-doing and refusal to reconcile for an additional two years. The policy of society and the State is to encourage preservation of marriage by reconciliation rather than to reward a refusal to be reconciled.

. . .

This Court is not oblivious to the hardships imposed by necessity upon estranged spouses. The peculiar situation of these parties makes their hardships more onerous than usual. The courts do not have unlimited power to relieve hardship and license pleasure, at the expense of undue hardship to innocent parties.

*Abney v. Abney,* 61 Tenn.App. 531, 456 S.W.2d 364, 368–69 (1970).

In 1988, a divided Tennessee Supreme Court came to grips with the conflict between fault statutes and the practical appeal of no-fault principles. In *Thomasson v. Thomasson,* 755 S.W.2d 779 (Tenn. 1988), both parties sued for divorce and both parties proved adequate fault. Following existing Tennessee case law, the majority of the court held:

The result is that Husband has proven a cause of action for divorce to which Wife is without a valid defense and Wife has proven a cause of action for divorce to which Husband is without a valid defense. In such circumstances the Court cannot award a divorce to either party and their respective suits must be dismissed. *See Brewies v. Brewies,* 27 Tenn.App. 68, 178 S.W.2d 84 (1944) and *Akins v. Akins, supra* [61 Tenn.App. 506, 456 S.W.2d 354 (1969) ].

*Thomasson,* 755 S.W.2d at 787.

Chief Justice Harbison, concurring with Justices Fones and Cooper in sustaining the trial court action dismissing both

cases, first noted that the result suggested in Justice Drowota's dissent was appealing. Next, Justice Harbison observed that the statutes dealing with grounds for divorce had not been amended since being construed in *Brewies v. Brewies,* 27 Tenn. App. 68, 178 S.W.2d 84 (1943), "[e]xcept for the adding of some grounds not based upon fault, such as irreconcilable differences and separation for three consecutive years." *Thomasson,* 755 S.W.2d at 788 (Harbison, J., concurring). Justice Harbison then succinctly stated the case for the majority:

> The General Assembly is presumed to know the construction and interpretation of statutes by the courts. *See Hamby v. McDaniel,* 559 S.W.2d 774, 776 (Tenn. 1977). The General Assembly has met repeatedly since the *Brewies* case was decided, and it has not changed the basic provisions of the fault-based statutes.
>
> Rightly or wrongly, the divorce code, except for the statutes based on irreconcilable differences or absence for three years, consists of grounds comprising fault or misconduct. The divorce proceeding, again rightly or wrongly, is basically adversarial, being instituted by a sworn petition in which collusion must be denied. T.C.A. § 36–4–107. A jury trial may be demanded. T.C.A. § 36–4–113. Proof is required even when the allegations of the complaint are confessed, except for cases of irreconcilable differences. T.C.A. § 36–4–114. That section provides:
>
> > If the defendant admits the facts charged in the bill or petition and relied upon for the ground for a divorce, or the bill be taken for confessed, the court shall, nevertheless, before decreeing a divorce, except a divorce on the ground of irreconcilable differences, hear proof of the facts alleged as aforesaid, and either dismiss the bill or petition or grant a divorce, as the justice of the case may require.
>
> T.C.A. § 36–4–119 provides:
>
> > If, upon hearing the cause, the court is satisfied that the complainant is entitled to relief, it may be granted either by pronouncing the marriage void from the beginning, or by dissolving it forever and freeing each party from the obligations thereof, or by a separation for a limited time.
>
> Obviously, there could be no valid distinction between a "complainant" and a counter-claimant. If both are entitled to a divorce under these fault-based statutes then, in my opinion, the law has been and remains that neither is entitled to obtain a divorce.
>
> This result may not be socially appealing, as suggested by the dissent. Nevertheless, in my opinion, well-settled construction of established statutes should not be changed simply because of that fact.
>
> If the General Assembly for the state wishes to adopt the principle of dual divorce, it may do so by amending existing statutes. Unless and until it does so, however, in my opinion the established interpretation of the statutes should be retained.

*Thomasson,* 755 S.W.2d at 788–89 (Harbison, J., concurring).

Justice Drowota, with whom Justice O'Brien concurred, dissented pointing out that statutory changes in recent years pointed toward a change in public policy, diminishing the requirement of fault and trending toward no-fault.

> The revisions of our divorce and alimony statutes have in my view worked a change in the public policy of this state regarding divorce. Divorce can no longer be understood solely as a remedy for the innocent spouse against the guilty

spouse. This is not to say that fault is irrelevant. Fault-based grounds, such as the ones at issue in the instant case, obviously remain, as well as fault-based defenses. *See, e.g.,* T.C.A. §§ 36–4–112, 36–4–120. And fault is one factor among many in determining alimony.

. . .

This Court has already recognized the public policy at issue in this case.

There is, however, another public policy consideration that is applicable in the aftermath of a hopelessly broken marriage, that was enunciated by this Court many years ago, a policy that also undergirds the legislative enactment allowing divorce on the ground of irreconcilable differences. In *Farrar v. Farrar,* 553 S.W.2d 741 (Tenn.1977), Mr. Justice Henry, writing for the Court said: "We fully recognize that considerations of public policy demand that the institution of marriage be sheltered and safeguarded. But there is an obverse side to the coin of public policy and consideration must be given to the fact that society is ill served by a legally commanded continuance of a marriage which exists in name only. We quote from the opinion of the late Chief Justice Grafton Green, in *Lingner v. Lingner,* 165 Tenn. 525, 534, 56 S.W.2d 749, 752 (1933): As pointed out by another court, we must take into consideration 'the mischiefs arising from turning out into the world, in enforced celibacy, persons who are neither married nor unmarried.' (Citation omitted.) Society is not interested in perpetuating a status out of which no good can come and from which harm may result." 553 S.W.2d at 744, 745.

*Thomasson,* 755 S.W.2d at 792 (Drowota, J., dissenting).

It must be noted that in *Thomasson,* both parties sued for divorce and both parties adequately proved fault grounds for divorce while in the present case Mr. Earls only has sued for divorce and Ms. Earls, as to the divorce itself, seeks only a dismissal of Mr. Earls' complaint.

If *Thomasson* was an open invitation to the General Assembly, it produced only a modest response. Chapter 393 of the Acts of 1989 reduced the continuous separation time of Tennessee Code Annotated section 36–4–101(12) (now 15) from three years to two years. Chapter 489 of the Acts of 1989 and chapter 234 of the Acts of 1991 made procedural amendments to Tennessee Code Annotated section 36–4–103, relative to irreconcilable differences without altering the consent requirements for a divorce on such grounds. Chapter 543 of the Acts of 1989, (now Tennessee Code Annotated section 36–4–129), provided that the parties may stipulate grounds for divorce but is ineffective in the absence of such stipulation.

The experience of the State of Illinois is instructive in this case. Prior to the Illinois Marriage and Dissolution of Marriage Act of 1984, Illinois was a fault state. In *Sharpe v. Sharpe,* 9 Ill.App.3d 667, 292 N.E.2d 566 (1973), the plaintiff sought a divorce for mental cruelty with the trial court holding that she had failed to carry her burden of proof. The judgment of the trial court was affirmed on appeal with the court making the following observation: "While it is true that this marriage has doubtless reached the point where reconciliation is not possible, it is not the function of the courts to determine that parties to an impossible marriage situation are entitled to a divorce merely on the grounds that they cannot live together. It is the function of the legislative branch of the government of this state to determine whether or not divorces should be granted regardless of fault." *Id.* at 568.

Some years later in the case of *In re Marriage of Bates,* 141 Ill.App.3d 566, 95

Ill.Dec. 922, 490 N.E.2d 1014 (1986), suit was filed in 1980 on grounds of mental cruelty with the trial court holding that plaintiff had failed to carry his burden of proof. The court granted the defendant's cross-petition for legal separation by decree entered June 1, 1984. While the case was on appeal, the General Assembly of Illinois passed the Illinois Marriage and Dissolution of Marriage Act providing for no-fault divorce. The Court of Appeals of Illinois applied the new act, declared the marriage of the parties irretrievably broken, and granted the husband a divorce on no-fault grounds.

In *In re Marriage of Smoller*, 218 Ill. App.3d 340, 161 Ill.Dec. 129, 578 N.E.2d 256 (1991), the husband filed suit for divorce on irreconcilable differences among other grounds. The evidence disclosed that he had found another woman and did not wish to continue to be married to the wife. The trial judge denied the divorce, and the husband appealed. In reversing the trial court under no-fault, the court held:

We note that, in cases decided prior to codification of section 401(a)(2), Illinois courts recognized that dissolutions should not be lightly granted under the Act in furtherance of an expressed public policy to preserve marriages. Adoption, in 1984, of section 401(a)(2) and its provision for dissolution based on irreconcilable differences, however, indicates our General Assembly recognized the policy no longer served when the State's interest in preserving a marriage is not also shared by the parties themselves. It seems clear that included as a legitimate object of a marriage is the fulfillment of each party's desire to continue in that legally sanctioned union, evidenced by the absence of differences so serious as to undermine the marriage relationship. The critical inquiry here, given satisfaction of the other requirements of section 401(a)(2), is whether that section permits a finding of irreconcilable differences where only one of the parties desires to maintain the union.

We must conclude that it does. Where evidence shows one spouse clearly desires to no longer continue to be married to the other, an irreconcilable difference necessarily arises between them causing an irretrievable breakdown of the marriage. Indeed, if a greater difference can exist within the context of a marriage relationship than one between spouses where one refuses to continue as the spouse of the other, we are at pains to conceive of it. As observed by Justice Robertson of the Supreme Court of Mississippi:

"That one spouse out of blindness, obstinance or nostalgia refuses to recognize it hardly means that a marriage may not in fact * * * be irretrievably broken. As a matter of common sense, there can be irreconcilable differences within a marriage even when one spouse refuses to accept or recognize that fact."

(*Gallaspy v. Gallaspy* (1984), 459 So.2d 283, 287 (Robertson, J., dissenting).) We believe a contrary interpretation of section 401(a)(2) would be inconsistent with the intent to provide a no-fault provision for the dissolution of marriages. We therefore determine that evidence may establish, as in other cases where irreconcilable differences are alleged, the existence of such a basis to support the dissolution of a marriage under section 401(a)(2) where even one spouse does not desire to continue to be married to the other. See *Gallaspy v. Gallaspy* (1984), 459 So.2d 283, 287 (Robertson, J., dissenting).

*Smoller*, 161 Ill.Dec. 129, 578 N.E.2d at 259 (citations omitted).

In *Cary v. Cary*, 937 S.W.2d 777 (Tenn. 1996), the Supreme Court of Tennessee acknowledged and applauded the nationwide trend toward no-fault divorce in a case involving the validity of an antenuptial agreement which waived alimony. The court made the following statement:

In Tennessee, as in most every other state, there has been a shift in public policy by the General Assembly regarding dissolution of marriage. A divorce may be obtained on the grounds of irreconcilable differences, without a showing of fault on the part of either parties. *See* Tenn.Code Ann. § 36–4–101(11) (1991 Repl.). Accordingly, the potential for abuse which the *Crouch [v. Crouch*, 53 Tenn.App. 594, 385 S.W.2d 288 (1964)] court predicted might flow from enforcement of provisions waiving or limiting alimony, is not present. A spouse who desires a divorce may obtain it without a showing of fault.

. . .

In Tennessee, the legislative shift in public policy regarding dissolution of marriage reflected by our no fault divorce statutes, the legislative changes in alimony placing men and women in equal bargaining positions, the Legislature's specific approval of antenuptial agreements regarding property, and contemporary society's changed view of the roles of men and women all dictate an abandonment of the old court-made common-law rule prohibiting antenuptial provisions which limit or waive alimony for reasons of public policy.

*Cary*, 937 S.W.2d at 781.

The Tennessee Supreme Court in *Cary* comes about as close to sanctioning pure no-fault divorce as a court can do. However, it does not purport to remove the statutorily mandated conditions on no-fault divorce in Tennessee. Irreconcilable differences, as a grounds for divorce in Tennessee, still requires a signed marital dissolution agreement, and a two year separation, as a grounds for divorce, still applies only to marriages where no minor children are involved.

Given the state of the law in Tennessee, it is incumbent upon Mr. Earls in the case at bar to establish that Ms. Earls is at fault before he is entitled to a divorce on grounds of inappropriate marital conduct. The trial court held that he had failed to carry his burden of proof, and in my opinion, the evidence in this record certainly does not preponderate against the factual findings of the chancellor in this regard. It is disingenuous, at best, to find Ms. Earls at fault because she suffered quadriplegia caused by events beyond her control and thereafter could not display superhuman qualities. The action of the trial court in refusing to grant a divorce to Mr. Earls should be affirmed.

## V.   Legal Separation

In her original cross-claim, Ms. Earls sought neither divorce nor divorce from bed and board.[1] Her prayers for relief were limited to having the July 16, 1998 MDA declared null and void, restraining Mr. Earls from dissipating marital assets, enjoining Mr. Earls to keep Ms. Earls insured under his health insurance with his employer and having the court award temporary support and maintenance, alimony in futuro, attorney fees and general relief. After the amended complaint of Mr. Earls filed December 14, 1998 asking divorce upon grounds of inappropriate marital conduct, Ms. Earls sought only to have the

---

1.  Chapter 1059 of the Public Acts of 1998 which, among other things, amended T.C.A. § 36–4–102 to provide for legal separation rather than divorce from bed and board did not become effective until January 1, 1999.

complaint dismissed and her attorney fees and expenses paid.

On March 10, 1999, the day following the first day of the trial, Ms. Earls filed a document entitled "Wife's Prayer for Relief." These prayers for relief sought in part, alimony in futuro, continued medical insurance coverage, a property division and attorney fees. Such prayers for relief by Ms. Earls are consistent with the separate maintenance provisions of the trial court judgment. This case is much akin to *Stephenson v. Stephenson*, 201 Tenn. 253, 298 S.W.2d 717 (1957), where the husband sought divorce and was unable to prove grounds for divorce. In distinguishing *Lingner v. Lingner*, 165 Tenn. 525, 56 S.W.2d 749 (1933), the Supreme Court in *Stephenson* observed:

> But a different situation presents itself here. The complainant, in her bill did not pray for a divorce, either from bed and board or from the bonds of matrimony, and did not plead any one of the statutory grounds of divorce; but on the contrary averred that she was not seeking a dissolution of the marriage ties, but an affirmation of them; and her prayer was for separate support and maintenance.

*Stephenson*, 298 S.W.2d at 719. The court held that a divorce could not be granted without grounds simply because there was no hope of reconciliation. *Id.* The court upheld separate maintenance for the wife holding that such obligation of the husband was not dependant upon divorce statutes, but that the chancery court had inherent power independent of statute to grant such relief. *Id.* at 719–20.

This court in *Clabough v. Clabough*, No. 01A01–9605–CV–00200, 1996 WL 668345 (Tenn.Ct.App.1996), faced a similar situation. In that case, the husband sued the wife for divorce charging inappropriate marital conduct. The wife answered with a general denial but request for support, maintenance and custody of the minor children along with general relief. The trial court held that the allegations of the complaint were not sustained by the evidence but that the wife was entitled to separate maintenance, support and a division of assets under the terms of Tennessee Code Annotated sections 36–4–121 and 36–5–101. This court observed that Mrs. Clabough's answer did not allege any facts relating to separate maintenance and support but that her answer did contain a prayer for such relief. In upholding separate maintenance, this court held:

> The case of *Stephenson v. Stephenson*, 201 Tenn. 253, 298 S.W.2d 717 (1957) involved almost identical facts. In that case, the wife filed a cross bill for divorce but later amended the answer to delete the grounds alleged and the prayer for divorce. Thus, the case went to trial on the original bill and an answer containing a prayer for separate maintenance. When the court found that the husband failed to prove his grounds for divorce, the court entered a decree of separate maintenance. Although the propriety of that action was not involved in the subsequent appeal, the Supreme Court stated that the courts have the inherent power to award separate support and maintenance. The power does not rest on the divorce statutes but is founded on the obligation to support the wife.

> In *Roberts v. Roberts*, 22 Tenn.App. 651, 125 S.W.2d 199 (1939), this court said, "The right of a wife to separate maintenance is founded on the duty of the husband arising out of the marital relationship to support the wife. She may have it awarded in a divorce proceeding under the prayer for general relief even though a divorce be denied

her." 22 Tenn.App. at 654, 125 S.W.2d at 201.

We hold that the trial court's action was proper under the pleadings.

*Clabough,* 1996 WL 668345 at * 2.

In *Flanagan v. Flanagan,* No. 03A01–9612–GS–00404, 1997 WL 360566 (Tenn.Ct. App.1997), the wife sought divorce on inappropriate marital conduct with the husband answering that the wife was not entitled to a divorce and filing no counterclaim. Recognizing the *Lingner–Farrar* admonition, the Court of Appeals nevertheless held that the evidence preponderated against the judgment of the trial court and that the wife was not entitled to a divorce on inappropriate marital conduct. The court stated:

> Taking her testimony at face value, it simply does not make out the grounds set forth in T.C.A. § 36–4–102(a)(1). As the Supreme Court said in the *Perrin* case, we "cannot by judicial fiat add an additional ground for divorce." [*Perrin v. Perrin,* 201 Tenn. 354] 299 S.W.2d [19] at 24 [ (1957) ]. To approve an absolute divorce based on this testimony would amount to judicial legislation. That is not our role. If this state is to recognize the type of conduct shown in this case as a ground for divorce in a contested setting, it must be accomplished by legislative enactment.

*Flanagan,* 1997 WL 360566 at * 2. Thus did the *Flanagan* court face the same problem we face in the instant case with the husband and the wife. The *Flanagan* court decreed separate maintenance, holding:

> We vacate the trial court's grant of an absolute divorce. We recognize that Husband has testified that he does not want Wife to return to him. It is likewise clear that Wife has no intention of resuming a marital relationship with Husband. Pursuant to our authority under Rule 36. T.R.A.P., we modify the trial court's judgment to provide that the parties will reside separate and apart, i.e., separate maintenance. A trial court "has the inherent power, independent of statute, to grant the relief [of separate maintenance] in proper cases, where a divorce is not sought or in which the complainant is not entitled to a divorce." *Stephenson v. Stephenson,* 201 Tenn. 253, 298 S.W.2d 717, 719–20 (Tenn.1957). At an appropriate time, Wife is at liberty to seek an absolute divorce pursuant to applicable statutory authority.

*Flanagan,* 1997 WL 360566 at * 3.

Following *Stephenson, Clabough* and *Flanagan* along with Tennessee Code Annotated section 36–4–101(a)(1), and taking into consideration the changes effected by chapter 1059 of the Public Acts of 1998, particularly as is now codified at Tennessee Code Annotated section 36–4–102(c) [2], I would decree separate maintenance and then consider the custody, alimony and attorney fees issues inherent in a decree of separate maintenance.

## VI. Custody

In her answer to the original complaint, Ms. Earls did not seek custody of the eight year old son of the parties. Ms. Earls did not seek custody of the minor child in her answer to the amended complaint. Rather, she made the following assertion: "1. Wife admits the parties have one minor child, Sage. Based upon the stipulation

---

2. "Legal separation shall not affect the bonds of matrimony but shall permit the parties to cease matrimonial cohabitation. The court may provide for matters such as child custody, visitation, support and property issues during legal separation upon motion by either party or by agreement of the parties." Tenn. Code Ann. § 36–4–102(c) (Supp.1999).

entered into by the parties regarding custody, there is no further need to respond to the averment." Ms. Earls did not seek custody in her pleading styled "Wife's Prayer for Relief". Rather, she sought to preserve for herself a comparative fitness analysis in the future so that if her health improved, it could be considered as a material change in circumstances.

At the very outset of the trial, before any evidence was offered, the following discussion between the court and the parties' attorneys occurred:

MR. DAVIES: Let me go ahead and address the issue of custody, when I took Mr. Earls' deposition on December the 11th, 1998, we entered into a stipulation on—on the custody, and I think it would be best for me just to read that into the record. And what my proposal does is simply track what that stipulation was.

This is me speaking: "While we're on the record, what I'd like to do is just confirm what the parties wanted to do in terms of custody of Sage. And I'll do my best to state that. If I don't do it correctly, let me know.

We have agreed that the custody of Sage should be joint custody in both parties; that primary physical care of Sage should be with Mr. Earls, and that we will work out our visitation."

And Ms. Ryan said: "Yes."

And then I went on to say: "The other part of the stipulation is that because Ms. Earls has the physical disability, in the event she is able to rehabilitate herself to the point that she physically can take care of Sage, she would have the opportunity to petition the Court to take another look at the custody situation and have a comparative fitness analysis that—that one would not ordinarily have—"

And Ms. Ryan said, "Right."

And I finished my sentence: "—in this set of circumstances."

So what we're basically saying is, in the event she is able to rehabilitate herself, that is a change of circumstances that allows her to come back. And—and that—I think we all—and that was the stipulation.

Is there any disagreement with that?

THE COURT: Is there any disagreement in that regard?

MR. RYAN: Well, Mr.—Mr. Earls, as far as working out some around the details in—in making a matter of semantics based on—I don't know whatever visitation comes out, but he had indicated that he wanted custody and then have—again, have that issue, the same thing, only not calling it joint custody, Your Honor. That's what he has indicated.

THE COURT: Well, let's throw out just an alternative idea that they may not have thought about. What if we do order joint custody, but just designate him as the residential parent? That way you don't have to worry about this standard, something comes up and she improves her situation, then you just start from scratch. And don't—don't call it physical custodian and open up that can of worms. Just say joint custody. Hopefully, these two folks will be able to raise this child jointly if nothing else changes. And if—he would be the residential parent. And then we can talk about visitation if you want to, or if you all want to carve out the times, we can do that. How does that sound to you, Mr. Davies?

MR. DAVIES: That's fine. That's—I think that's the stipulation calling it another thing. That's fine.

MS. RYAN: That's fine.

THE COURT: That may help—that may help with later burdens in the future. That makes it real clear. And—and when the child grows up, the child looks back on this situation, if they never come back into Court, that the child can applaud the parents for trying to be as fair and equitable under the circumstances by making this real clear by that.

MS. RYAN: I—I don't think we have any problem with that at all, Your Honor.

THE COURT: All right. Ms. Earls, how does that sound to you?

MS. EARLS: Yes.

*THE COURT: Okay. Then that would be the decree of the court with respect to the custody issue.* (emphasis added).

In the wake of the preceding conversation, neither party introduced any evidence relative to custody since, under the pleadings and the stipulation agreed to by the trial judge, there was no triable issue as to custody. Two days of trial on oral testimony followed. At the conclusion of the trial, the trial court, without notice, without motion written or oral, and without any party challenging the custody agreement approved by the court before the trial ever started, sua sponte ruled:

Now this is the tough part. Because this child clearly has been suffering as a result of this litigation, and I have looked at the factors set forth in the custody statute, I've heard the proof, and I've considered what the parties have had to say about Sage, but I'm going to make a ruling that I think is mandated by the statute, which is 36–6–106, because any time a request for custody determination is placed before a judge having custody jurisdiction adjudication, the statute says the court shall consider ten factors and make a custody

determination. And I've done that. I've made a list of these factors and I have a check list and tried to weigh these factors. And clearly the factor that relates to one parent's physical ability to provide for the physical needs of a child militates greatly in Mr. Earls' favor.

However, if you look at all these factors that's not the one factor I'm supposed to follow. I'm supposed to look at all the factors. And having considered the credibility of the witnesses and all of the evidence, I can not conclude but one thing in that custody of Sage shall be awarded solely to Ms. Earls. And that's what I'm going to do today.

Now, I want to say this about that. I don't think I need to go down each factor. I've weighed every one, all ten. I've gota list here. If someone later wants me to make specific findings in that regard I'll entertain that. But suffice it to say that both of [the] parties need help with this child. That's what's gotten Mr. Earls in trouble with Ms. Moore. He's not there at night on many nights. And as far as this Court is concerned, from a support standpoint, the support that Ms. Earls has is vastly superior to the support that Mr. Earls has. Since Mr. Earls' support has developed into an inappropriate romantic relationship, it militates even more in favor because rightly or wrongly the Tennessee Supreme Court said in *Suttles v. Suttles* that when the Courts determine issues of custody and visitation, they're also not to determine—to look at evidence that may jeopardize a child in the physical sense but the courts are to look at definite evidence of whether a child is jeopardized in a moral sense. As long as these people remain married it morally jeopardizes this child to be exposed to Ms. Moore overnight with

Mr. Earls in what is clearly, at least on the surface, perceived at this point in time to be a romantic situation. That's not good for Sage to see that.

Now if you all were divorced and you're not divorced, this issue would probably be mostly moot but it's not. Therefore I'm awarding Ms. Earls custody.

Child custody decisions must be based upon a "comparative fitness" analysis by the trial court. *Bah v. Bah,* 668 S.W.2d 663, 666 (Tenn.Ct.App.1983). In this comparative fitness analysis, the court must weigh the factors enumerated in Tennessee Code Annotated section 36–6–106. *Gaskill v. Gaskill,* 936 S.W.2d 626, 630 (Tenn.Ct.App.1996). Once this comparative fitness analysis is made and custody is awarded by the trial court, such decision is *res judicata* upon the facts in existence or reasonably foreseeable when the decision was made. *Adelsperger v. Adelsperger,* 970 S.W.2d 482, 485 (Tenn.Ct.App.1997). When the issue before the court is whether to modify a prior custody order, it is not necessary to repeat the comparative fitness analysis but instead the burden rests upon the non-custodial parent to prove a material change in circumstances compelling enough to warrant a change of custody. *Musselman v. Acuff,* 826 S.W.2d 920, 922 (Tenn.Ct.App.1991).

What the parties and the trial court apparently attempted to do at the outset of the trial was to stipulate a custody arrangement whereby Mr. Earls would retain primary physical custody of the child but Ms. Earls would be relieved of the obligation in a future petition for change of custody to prove a material change of circumstance. Under the stipulation, the court would instead, on the filing of such future petition, go directly to a comparative fitness analysis. It is in large part a stipulation of law rather than a stipulation

of fact. It purports to relieve Ms. Earls of her burden of proof to establish a change of circumstances and further to relieve the trial court of its obligation of adjudicating the question of whether or not a change of circumstances has been established. The validity of such a stipulation is questionable, *Holms v. Johnston,* 59 Tenn. 155 (Tenn.1873), but under the circumstances of this case the validity of the stipulation is a secondary consideration. Both parties and the court agreed to the stipulation pre-trial, and on the strength of such an agreement, neither party offered evidence on the custody issue. The trial court at the conclusion of the trial disregarded the stipulation, made a comparative fitness analysis using the factors in Tennessee Code Annotated section 36–6–106 and awarded custody to Ms. Earls without the custody issue ever being tried. All parties agree on appeal that this action is erroneous and must be reversed.

I disagree with the majority opinion finding that, since Ms. Earls has never sought custody in her pleadings, the initial primary physical custody award to Mr. Earls should remain in effect and Ms. Earls has the burden of establishing a change of circumstances. I would hold that unless Ms. Earls amends her pleadings under Tennessee Rules of Civil Procedure 15 in order to seek a change of this custody arrangement, there is no issue to be tried and primary physical custody should remain with Mr. Earls. I would further find that if Ms. Earls amends her pleadings to seek custody, then the entire custody issue should be tried on the merits including an initial comparative fitness analysis, since the custody issue has never been tried at all and since Ms. Earls was entitled to rely on the court approved stipulation the same as Mr. Earls was.

## VII. Spousal Support

As the majority holds, Ms. Earls has a monthly government disability check in the

amount of $648. Mr. Earls' net monthly income is approximately $1,640. As long as Mr. Earls retains custody of Sage, he receives monthly SSI payments of $323 for the child. Since the majority holds that Mr. Earls retains custody pending proof of a change of circumstances, I concur in the holding that Mr. Earls should continue to receive these SSI payments. I also concur in the spousal support provisions of the majority opinion, except for the holding that "neither the amount nor duration of this support shall be modified or extended." In my view, this matter remains subject to trial court review through March 31, 2006.

## VIII. The Injunction as to Laura Moore

While Mr. Earls' downplaying of the extent of his personal relationship with Laura Moore is suspect under the proof in this case, the reaction of the trial court is nothing short of astounding. Specifically, the court held:

Mr. Earls will be enjoined and restrained from bringing this child around Lorie Moore or Laura Moore and/or having Laura Moore at your home while you have the child during visitation. This may seem harsh to you Mr. Earls, but it's as far as I'm concerned in the eyes of the Court based upon the evidence you're still married to Ms. Earls and until an appellate court may tell me otherwise, and so until then not only are those restraining orders going down, but I'm going to permanently enjoin and restrain you from coming around Laura Moore, period. That if she comes around you you can't stop that, but you coming around her. That may seem harsh but that's to promote and protect the marriage relationship which exists and will exist in this case until I'm reversed or something new comes before the Court.

It is not surprising that no party on this appeal attempts to defend this action of the trial court. Neither the trial court nor any other court has the power to command a reconciliation between Mr. Earls and Ms. Earls here. Neither the trial court nor any other court has the power to command Mr. Earls to cease and desist whatever relationship is mutually acceptable to himself and Laura Moore. The presence of Laura Moore in this case has no significance at all between the parties except to possibly provide Ms. Earls with grounds for a divorce which she does not seek. The only power vested in the trial court or this court concerning Laura Moore is the effect that the relationship between Mr. Earls and Laura Moore may have in the custody adjudication as to Sage which has not yet been tried. This injunction issued by the trial court in this respect was stayed by previous order of this court and I concur with the majority that it should now in all respects, be dissolved.

## IX. Conclusion

Accordingly, I dissent from the court's decision granting a divorce finding instead that the action of the trial court in dismissing the complaint for divorce filed by Mr. Earls should be affirmed. I would also find that the action of the trial court in ordering separate maintenance, payable by Mr. Earls to Ms. Earls, should be affirmed for reasons stated herein and under the authority of *Stephenson, Roberts, Clabough,* and *Flanagan.* Finally, it is my opinion that the action of the trial court in granting custody of the minor child Sage to Ms. Earls, having previously been stayed by order of this court, should now be reversed and remanded for further proceedings on the merits if Ms. Earls would choose to seek, by proper pleadings, a change in the custody arrangements previously agreed to by the parties and the trial court. The injunction prohibiting Mr.

Earls from associating with Laura Moore has been previously stayed by this court, and I concur with the majority that it should now be in all respects dissolved.

The judgment of the majority is more appealing in effecting closure of the relationship between this unfortunate young husband and wife. Like Chief Justice Harbison in *Thomasson* and like Judge Susano in *Flanagan,* however, I conclude that the existing divorce statutes in Tennessee provide no basis for the grant of a divorce in this case. Until Tennessee chooses to follow Illinois or other states enacting a pure no-fault divorce statute, Tennessee courts have no power to judicially legislate such a divorce. The majority avoids this truism by finding "fault" on the part of Ms. Earls. Since I am unable to find any evidence in this record to justify such a finding, I respectfully and reluctantly dissent.

## OPINION DENYING PETITION FOR REHEARING

KOCH, J. delivered the opinion for the court, in which CAIN, J. and COTTRELL, J. joined.

(Filed June 20, 2000)

Shirley Ann Earls has filed a petition pursuant to Tenn.R.App.P. 39 requesting this court to reconsider portions of its May 31, 2000 opinion. Even though the petition raises issues that have already been carefully considered by each member of the court, the nature of the case prompts us to file this opinion elaborating on our initial opinion.[1]

Each member of the court has read the entire record on appeal and is fully aware

of the unfortunate and difficult circumstances in which Clark Earls and Shirley Earls find themselves. Our original opinions reflect our best efforts to employ traditional legal principles to do justice between these two persons in light of our understanding of the facts and the current governing law. Our opinions also reflect our recognition of the practical limitations on both trial and appellate courts when they undertake to sort out and rearrange the personal and financial relations of parties whose marriage is irretrievably broken. Judges cannot rekindle love and affection once it has been extinguished. Nor can they provide assets or income that the parties themselves do not have. Nor can they restore to good health persons who bodies have been broken by unexpected catastrophic injury. Judges must take the parties as they find them and must consider the facts of each case objectively. They must also apply the applicable legal principles to these facts in a disciplined, dispassionate way. The three opinions filed in this case on May 31, 2000 reflect that each member of the court has discharged this obligation.

## I.

### THE PROPRIETY OF THE DIVORCE

Ms. Earls first asks us to reconsider the majority's conclusion that the facts supported entering an order in accordance with Tenn.Code Ann. § 36-4-129 (Supp. 1999) declaring the parties divorced. This request stems from Ms. Earls' belief that the majority has embraced the concept of "no fault" divorce and that the record contains no evidence of a series of misconduct on her part that provides Mr. Earls with

---

1. Prior to the filing of Ms. Earls' petition for rehearing, each member of this court received a lengthy letter from the trial court regarding the substantive issues raised by the parties and addressed by the court in our May 31,

2000 opinions. The trial court's letter was not considered by this court and has not influenced our deliberations or decisions regarding the issues raised in Ms. Earls' petition for rehearing.

grounds for divorce. Ms. Earls is mistaken on both counts.

■ The majority's opinions do not depart from traditional legal principles to embrace the concept of "no fault" divorce. Neither the majority opinion nor the concurring opinion can reasonably be construed to hold that parties may be divorced without some proof or stipulation of one or more of the statutory grounds for divorce or that trial courts must grant a divorce every time the parties themselves have agreed that continued cohabitation is unacceptable. To the contrary, all three opinions filed on May 31, 2000 rest on the following settled, well-recognized principles:

(1) that a divorce must rest on one of the statutory grounds for divorce, see *Clothier v. Clothier*, 33 Tenn. App. 532, 538, 232 S.W.2d 363, 366 (1950);

(2) that trial courts should be afforded wide latitude to determine whether the parties in a particular case should be divorced, see *Marmino v. Marmino*, 34 Tenn.App. 352, 355, 238 S.W.2d 105, 107 (1950);

(3) that appellate courts must review a trial court's findings of fact in a divorce case using the Tenn.R.App.P. 13(d) standard of review, see *Hansel v. Hansel*, 939 S.W.2d 110, 111 (Tenn.Ct.App.1996); and

(4) that Tenn.R.App.P. 36(a) empowers appellate courts reviewing decisions in divorce cases to grant the relief, consistent with the facts and the applicable law, to which the parties are entitled. *See Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn.Ct.App.1994);

*Mondelli v. Howard*, 780 S.W.2d 769, 772–73 (Tenn.Ct.App.1989).

As Judge Cottrell points out in her concurring opinion, this court's differences revolve around the issue of whether the record contains sufficient evidence of inappropriate marital conduct by both parties to warrant declaring the parties divorced in accordance with Tenn.Code Ann. § 36–4–129. Judges Koch and Cottrell have answered this question in the affirmative; while Judge Cain has answered it in the negative. Accordingly, Judge Koch's and Judge Cottrell's opinions stand for only two propositions—first, that the evidence preponderates against the trial court's findings that the record contains no evidence of inappropriate marital conduct by Ms. Earls and that Ms. Earls would be "more aggressive in pursuing reconciliation" if Mr. Earls' divorce petition was dismissed and second, that these two persons should be declared divorced in accordance with Tenn.Code Ann. § 36–4–129 based on the facts of this case and the applicable state law. Judge Cain disagrees with the former proposition but would agree with the latter if he was convinced that the record contained evidence of inappropriate marital conduct on Ms. Earls' part.

Each member of the court has again reviewed the record and counsel's representations during oral argument in light of Ms. Earls' insistence that the record contains no evidence of a series of marital misconduct on her part that would warrant declaring the parties divorced. All judges adhere to their original decisions. Judges Koch and Cottrell again conclude that the record contains evidence of Ms. Earls' behavior[2] over a sustained period between

---

**2.** This behavior does not include Ms. Earls' injury or her rehabilitation efforts. Rather, the behavior involves her treatment of and attitude toward Mr. Earls. As Judge Cottrell points out in her concurring opinion, the record demonstrates that each party's conduct has caused the other party pain and distress and that neither party has any "intention,

March 1997 and July 1998 that caused pain and anxiety to Mr. Earls and that rendered continued cohabitation unacceptable.[3] For his part, Judge Cain adheres to his conclusion that the record contains no evidence of fault on Ms. Earls' part. Accordingly, the majority's conclusion remains that the record contains evidence of inappropriate marital conduct by both Mr. and Ms. Earls and, therefore, that the trial court should have declared them divorced in accordance with Tenn.Code Ann. § 36–4–129.

## II.

### SPOUSAL SUPPORT

Ms. Earls also takes issue with aspects of the decision regarding spousal support. She asserts that the court did not give appropriate weight to her prospects for rehabilitation, her predicament should her parents become unable to assist her, and the prospect that she will be required to obtain additional public assistance in the future. Each of these possibilities—and many others—were considered by the court during our original analysis of this case.

■ Our consideration of the support issue began with recognizing that the trial court's judgment would have rendered Mr. Earls financially unable to support himself.[4] In the process of addressing this problem, we took into consideration Ms. Earls' current physical condition, the duration of the marriage, the division of the marital assets and debts, and the other applicable factors contained in Tenn.Code Ann. § 36–5–101(d) (Supp.1999). We determined that the evidence does not support a conclusion that Ms. Earls will be capable of rehabilitating herself to the point where she could be financially self-sufficient. Accordingly, we declined to characterize the spousal support we awarded as "rehabilitative alimony." Rather, we fixed a definite amount of future support to be paid in monthly installments as authorized by Tenn.Code Ann. § 36–5–101(a)(2)(A).[5] After considering the factors in Tenn.Code Ann. § 36–5–101(d)(1), Judges Koch and Cottrell determined that Mr. Earls should pay Ms. Earls $450 per month through March 31, 2006.[6]

In apparent recognition of the limits on Mr. Earls' ability to pay support, Ms. Earls has not taken issue with the amount of the monthly payments set in the May 31, 2000 opinion. However, she insists that these payments should be left open-

---

hope, or desire to live with the other or to re-establish or maintain a marital relationship."

3. There is likewise evidence that Mr. Earls engaged in conduct during the same period that rendered continued cohabitation unacceptable to Ms. Earls.

4. That order required Mr. Earls to pay more money in spousal and child support and in payment of Ms. Earls' medical expenses than he earned. There can be little dispute that such an award cannot stand. The combined effect of spousal and child support awards cannot leave the obligor spouse unable to support himself or herself. *See generally Anderton v. Anderton,* 988 S.W.2d 675, 678–79 (Tenn.Ct.App.1998).

5. Tenn.Code Ann. § 36–5–101(d)(1) preserves the distinction between alimony in solido and rehabilitative support by stating that "[r]ehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony."

6. This amount includes payments of Ms. Earls' continued insurance coverage. In addition, Mr. Earls is still obligated to pay the accumulated unpaid medical expenses not covered by insurance that were incurred prior to the divorce.

ended. We have again reviewed our disposition of the spousal support question and have determined that based on the facts of this case and the applicable statutory factors enumerated both the duration and the amount of the support award are appropriate.

### III.

#### THE CUSTODY OF THE CHILD

As a final matter, Ms. Earls takes issue with a portion of the May 31, 2000 opinion establishing joint custody with Mr. Earls as the primary physical custodian. She concedes that she and Mr. Earls had agreed to this arrangement prior to trial but insists that her agreement was premised on her understanding that an improvement in her physical condition would be a change of circumstance that could trigger a re-examination of the custody issue.

■ This court's opinions regarding custody need to be understood for what they do and do not do. All members of the court have agreed that the evidence does not indicate that a joint custody arrangement would be inappropriate at the present time or that Mr. Earls is unfit to be the custodial parent in a joint custody arrangement.[7] In light of the parties' agreement and the child's interest in continuity and stability, Judges Koch and Cottrell have determined that the child's interests would be served best by establishing this arrangement by court order without further proceedings. Judge Cain would leave open an initial award of custody and remand to give Ms. Earls an opportunity to request custody, which she has not previously done.

There is no majority opinion regarding what Ms. Earls' burden of proof might be should she, at some future time, seek to change or modify the custody arrangement. Judge Koch, believing that parties cannot by agreement vary the legal standards for determining whether changing custody is in a child's best interests, has determined that Ms. Earls' burden of proof must be consistent with the traditional "material change of circumstances" burden of proof routinely followed in change-of-custody cases. Judge Cottrell has determined that the court need not address this issue in this proceeding. Judge Cain avoids the issue entirely by remanding the case for an initial custody hearing if Ms. Earls wants one.[8] With the court in this posture, our May 31, 2000 opinions do not definitely decide the burden-of-proof issue presently of concern to Ms. Earls. Thus, our May 31, 2000 opinions do not prevent Ms. Earls from seeking custody of the parties' child at any time or for any reason. Should she do so, she is free to present any argument to the court she wishes regarding her burden of proof, including the legal effect, if any, of the parties' original custody stipulation. The trial court is likewise free to use appropriate legal principles to decide what Ms. Earls' burden of proof should be.

### IV.

Based on our review of the record and our May 31, 2000 opinions in light of the points raised in Ms. Earls' petition for rehearing, all members of the court have determined that their original opinions

---

7. In this regard, all members of the court agree that the evidence preponderates against the trial court's conclusion that Mr. Earls is somehow "morally unfit" to be the child's custodial parent because of his relationship with Ms. Moore.

8. Judge Cain agrees that the ordered joint custody arrangement is proper if Ms. Earls does not timely request a custody hearing.

should stand without modification. Accordingly, Ms. Earls' petition for rehearing is respectfully denied. The costs of this petition for rehearing are taxed to Ms. Earls for which execution, if necessary, may issue.